Filed 11/28/18 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE ex rel. XAVIER BECERRA, as Attorney General, etc., | E070545 |
| Petitioners, | (Super.Ct.No. RIC1607135) |
| v. | ORDER MODIFYING OPINION |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | [NO CHANGE IN JUDGMENT] |
| Respondent; | |
| SANG-HOON AHN et al., | |
| Real Parties in Interest. | |

THE COURT

The opinion filed in this matter on November 27, 2018 is modified as follows:

In Justice Slough's concurring and dissenting opinion, on page 7, the footnote numbered 9 should be renumbered as footnote 1. The remaining footnotes in Justice Slough's opinion should then be renumbered accordingly so that footnote 10 is renumbered as footnote 2, and so on to the end of Justice Slough's opinion.

Except for these modifications, the opinion remains unchanged. This modification does not effect a change in judgment.

CERTIFIED FOR PUBLICATION

RAMIREZ           
                           P. J.

Filed 11/27/18; See Concurring and Dissenting Opinions (unmodified version)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE ex rel. XAVIER BECERRA, as Attorney General, etc., | |
| Petitioners, | E070545 |
| v. | (Super.Ct.No. RIC1607135) |
| | OPINION |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | |
| Respondent; | |
| SANG-HOON AHN et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate. Daniel A. Ottolia, Judge. Petition granted.

Xavier Becerra, Attorney General, Julie Weng-Gutierrez, Senior Assistant Attorney General, Joshua A. Klein, Deputy Solicitor General, and Niromi W. Pfeiffer, Gregory D. Brown and Darrell W. Spence, Deputy Attorneys General, for Petitioners.

1

No appearance for Respondent.

Larson O'Brien, Stephen G. Larson, Robert C. O'Brien, Steven E. Bledsoe, and Erica R. Graves; Life Legal Defense Foundation, Catherine W. Short, Allison K. Aranda, and Alexandra Snyder; and Karen M. Kitterman for Real Parties in Interest Sang-Hoon Ahn, Laurence Boggeln, George Delgado, Phil Dreisbach, Vincent Fortanasce, Vincent Nguyen, and the Christian Medical and Dental Society d/b/a the American Academy of Medical Ethics.

Law Office of Jon B. Eisenberg, Jon B. Eisenberg, O'Melveny & Myers, John Kappos, Bo Moon, Jason A. Orr, Tyler H. Hunt, and Kevin Díaz (admitted pro hac vice) for Real Parties in Interest Matthew Fairchild, Joan Nelson, and Catherine S. Forest.

Diane F. Boyer-Vine, Legislative Counsel, Robert A. Pratt, Principal Deputy Legislative Counsel, and Aaron D. Silva, Chief Deputy Legislative Counsel; Strumwasser & Woocher, Fredric D. Woocher, and Michael J. Strumwasser for the California State Senate and State Assembly as Amici Curiae on behalf of Petitioners.

Andrea Saltzman, in pro. per., as Amica Curiae on behalf of Petitioners.

Simpson Thacher & Bartlett and Simona G. Strauss for Death with Dignity National Center as amicus curiae on behalf of Petitioners.

In 2015, the Governor called a special session of the Legislature for certain specified purposes, including to "[i]mprove the efficiency and efficacy of the health care system, reduce the cost of providing health care services, and improve the health of Californians." During that session, the Legislature enacted the End of Life Option Act

2

(Health & Saf. Code, §§ 443-443.22) (Act), which legalized physician-assisted suicide[1] for the terminally ill.

In the action below, the trial court entered judgment on the pleadings, enjoining enforcement of the Act on the ground that it was not within the scope of the proclamation calling the special session, and therefore it was in violation of article IV, section 3, subdivision (b) of the California Constitution.

This extraordinary writ proceeding presents two key issues:

1. Have the parties challenging the constitutionality of the Act adequately alleged that they have standing to do so?

2. Was the trial court correct in ruling that the Act is unconstitutional?

We will hold that the challengers have not shown that they have standing. Hence, we do not reach the constitutional question.

---

[1] The terminology in this area is highly politicized. Proponents of the concept prefer "aid in dying" or "death with dignity"; opponents prefer "assisted suicide" or "euthanasia." There does not seem to be any wholly neutral term.

Google currently reports about 13,700,000 search results for "assisted suicide" and only about 376,000 for "aid in dying." Moreover, the Wikipedia article on the subject is entitled "Assisted suicide." We will use "assisted suicide" because it is the more common term, without intending to express any other opinion.

# I

## FACTUAL BACKGROUND

Because we are reviewing a judgment on the pleadings, we take the facts from the complaint, as well as from matters of which we may take judicial notice. (*People ex rel. Alzayat v. Hebb* (2017) 18 Cal.App.5th 801, 811.)

On June 16, 2015, the Governor issued a proclamation convening a special session of the Legislature for certain specified purposes, including to "[i]mprove the efficiency and efficacy of the health care system, reduce the cost of providing health care services, and improve the health of Californians."

On September 11, 2015, during the special session, the Legislature passed the Act. (Assembly Weekly History, Apr. 4, 2016, p. 14.) On October 5, 2015, the Governor signed it into law. (Stats. 2015-2016, 2nd Ex. Sess., ch. 1.) It went into effect on June 9, 2016. (Cal. Const., art. IV, § 8, subd. (c)(1); see Assembly Concurrent Resolution No. 1 (2015-2016 2nd Ex. Sess.); Assembly Weekly History (2015-2016 2nd Ex. Sess.), Apr. 4, 2016, p. 16.)

The Act allows an individual who has complied with all of its requirements to obtain and to use an "aid-in-dying drug." "Aid-in-dying drug" is defined, in part, as a drug that may be "self-administer[ed] to bring about . . . death . . . ." (Health & Saf. Code, § 443.1, subd. (b).)

First, the individual's attending physician must diagnose the individual as having a terminal disease. (Health & Saf. Code, § 443.2, subd. (a)(1).) "Terminal disease" is

4

defined as "an incurable and irreversible disease that has been medically confirmed and will, within reasonable medical judgment, result in death within six months." (Health & Saf. Code, § 443.1, subd. (q).) At that point, the individual may make a request to the attending physician for an aid-in-dying drug. (Health & Saf. Code, §§ 443.2, subd. (a), 443.3, subd. (a).)

The attending physician must refer the individual to a consulting physician (Health & Saf. Code, § 443.5, subd. (a)(3)), who must also diagnose the individual as having a terminal disease. (Health & Saf. Code, § 443.6, subd. (b).) If either the attending or the consulting physician finds indications that the individual has a mental disorder, he or she must refer the individual for a mental health specialist assessment. (Health & Saf. Code, §§ 443.5, subd (a)(1)(A)(ii), 443.6, subd (d).) There are many other steps that must be taken to ensure that the request is voluntary and not the product of a mental disorder, coercion, or a whim. (Health & Saf. Code, §§ 443.3, 443.4, 443.5, subd. (a), 443.6, 443.7, 443.8, 443.10, 443.11, 443.17, subd. (d).)

If all the conditions of the Act are met, the attending physician may prescribe an aid-in-dying drug to the qualified individual. (Health & Saf. Code, § 443.5, subd. (b).) The qualified individual may then self-administer the aid-in-dying drug. (See Health & Saf. Code, §§ 443.1, subd. (b), 443.13, subd. (a)(2), 443.14, subd. (a).)

"Actions taken in accordance with [the Act] shall not, for any purposes, constitute suicide . . . , homicide, or elder abuse under the law." (Health & Saf. Code, § 443.18; see also Health & Saf. Code, § 443.14, subd. (d)(2).)

5

A physician who participates in the process prescribed by the Act is immune from virtually all adverse legal consequences. (Health & Saf. Code, §§ 443.1, subd. (h), 443.14, subd. (c).) On the other hand, a physician is equally immune from "refusing to participate in activities authorized under this part, including, but not limited to, refusing to inform a patient regarding his or her rights under this part, and not referring an individual to a physician who participates in activities authorized under this part." (Health & Saf. Code, §§ 443.14, subd. (e)(2), 443.1, subd. (h).)

"Participation in activities authorized [by the Act] shall be voluntary. . . . [A] person or entity that elects, for reasons of conscience, morality, or ethics, not to engage in activities authorized [by the Act] is not required to take any action in support of an individual's decision under [the Act]." (Health & Saf. Code, § 443.14, subd. (e)(1).)

II

PROCEDURAL BACKGROUND

A.    *Events in the Trial Court*.

This action below was filed in June 2016. The plaintiffs are five individual physicians[2] along with a professional organization that promotes ethical standards in the medical profession[3] (collectively the Ahn parties). They asserted causes of action for

---

[2]    Dr. Sang-Hoon Ahn, Dr. Laurence Boggeln, Dr. George Delgado, Dr. Philip Dreisbach, Dr. Vincent Fortanasce, and Dr. Vincent Nguyen.

[3]    The Christian Medical and Dental Society, d/b/a the American Academy of Medical Ethics (Academy).

6

violations of due process, of equal protection, and of California constitutional limitations on the power of the Legislature to act in special session.

Initially, the only named defendant was Michael Hestrin, in his capacity as District Attorney of Riverside County. By stipulation, however, the Attorney General and "[t]he State of California . . . by and through the California Department of Public Health" (collectively the State) intervened as defendants.

In February 2018, the Ahn parties filed a motion for judgment on the pleadings. On May 15, 2018, after hearing argument, the trial court ruled that it would grant the motion, without leave to amend. On May 21, 2018, it entered a formal written order to that effect. On May 24, 2018, it entered judgment in favor of the Ahn parties and against Hestrin and the State. In the judgment, it enjoined enforcement of the Act.[4]

On May 29, 2018, three nonparties[5] (collectively the Fairchild parties) filed an ex parte application to vacate the judgment. They supported the Act and argued that the judgment was erroneous. On May 30, 2017, the trial court denied the application.

---

**4** As the State points out, the judgment was poorly drafted. For example, it did not enjoin enforcement of the Act in so many words; rather, it recited that enforcement of the Act had *already* been enjoined, even though it had not. The parties agree that the judgment is, in effect, an injunction.

Likewise, the judgment enjoined both Hestrin and the State, yet it stated that it was a judgment against the State alone. We construe it as a judgment against both.

**5** Matthew Fairchild and Dr. Joan Nelson, who have been diagnosed with terminal diseases and want to have access to assisted suicide, and Dr. Catherine S. Forest, a physician who treats patients with terminal diseases and wants to provide them with access to assisted suicide.

B.     *Events in This Court*.

On May 21, 2018, the State filed a petition for writ of mandate in this court, along with a request for an immediate stay.  Initially, we denied a stay.  On June 8, 2018, however, the State filed an amended petition along with a renewed request for an immediate stay.  On June 15, 2018, we issued an order to show cause and granted a temporary stay.

Meanwhile on June 6, 2018, the Fairchild parties filed an appeal from the judgment.  We ordered that the appeal and this writ proceeding be considered together.  We did not consolidate them.  Nevertheless, from this point on, the parties served their filings in the writ proceeding on the Fairchild parties.  Moreover, the Fairchild parties filed a return to the petition.  None of the parties objected to this.

III

THE STATUS OF THE FAIRCHILD PARTIES

In their separate appeal, the Fairchild parties contend that, as a result of the denial of their ex parte application to vacate the judgment, they have standing to appeal and, in that appeal, to challenge the judgment on the merits.  The Ahn parties dispute this.

The issue for us at present, however, is not whether the Fairchild parties are parties to the appeal, but only whether they are parties to this writ proceeding.

A party to a writ proceeding does not necessarily have to have been a party to the proceeding in the tribunal below.  (*Sonoma County Nuclear Free Zone v. Superior Court* (1987) 189 Cal.App.3d 167, 173, fn. 3; *Monterey Club v. Superior Court of Los Angeles*

8

(1941) 48 Cal.App.2d 131, 143.) "In writ proceedings, ""'real party in interest' has been generally defined as 'any person or entity whose interest will be directly affected by the proceeding . . . .' [Citation.] While the real party in interest is 'usually the other party to the lawsuit or proceeding being challenged' [citation], it may be . . . 'anyone having a direct interest in the result' [citation] . . . .'"" [Citation.]" (*Tabarrejo v. Superior Court* (2014) 232 Cal.App.4th 849, 859.) The Fairchild parties claim such a direct interest, in that they want access to assisted suicide under the Act, but the judgment enjoins enforcement of the Act.

Admittedly, the State's writ petition did not name the Fairchild parties (see *Tabarrejo v. Superior Court*, *supra*, 232 Cal.App.4th at p. 859), nor did the Fairchild parties formally move to intervene (see *Wright v. Jordan* (1923) 192 Cal. 704, 708-709, 714.) However, a person can become a party to an action, even if not named in the complaint, by appearing and participating without any objection by the other parties. (*Fireman's Fund Ins. Co. v. Sparks Construction, Inc.* (2004) 114 Cal.App.4th 1135, 1145-1147 and cases cited.) We see no reason why this principle should not also apply to a writ proceeding.

This is not to say that they are necessarily *proper* parties. It may be that, if their participation had been challenged, we would conclude that their joinder is improper. We simply conclude that they are parties for such purposes as whether they are subject to our jurisdiction, whether they are entitled to notice, and whether we can consider their return.

IV

THE PROPRIETY OF WRIT REVIEW

The State contends that review by writ is appropriate in this case.  The other parties do not dispute this.  Nevertheless, we address it briefly, because it goes to our jurisdiction.

It goes without saying that the judgment was appealable.  (Code Civ. Proc., § 904.1, subd. (a)(1).)  Indeed, both the State and the Fairchild parties have appealed from it.

"Extraordinary writ review by way of a petition for writ of mandate is ordinarily available only if the petitioner has no adequate legal remedy.  [Citation.]  An immediate direct appeal is presumed to be an adequate legal remedy.  [Citation.]  Writ review is appropriate, however, if . . . the issues presented are of great public importance and require prompt resolution.  [Citation.]"  (*Henry M. Lee Law Corp. v. Superior Court* (2012) 204 Cal.App.4th 1375, 1382-1383.)

Here, the availability of assisted suicide to terminally ill patients is an issue of great public importance.  Moreover, because terminally ill patients, by definition, are expected to die within six months, time is of the essence.  "Our receipt of numerous amicus curiae briefs underscores the importance of th[e] issue."  (*Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 657.)  We therefore exercise our discretion in favor of writ review.

## V

## STANDING IN THE TRIAL COURT

The State contends that the Ahn parties do not have standing to challenge the Act.

A.       *Additional Factual and Procedural Background.*

The Ahn parties alleged that they are California physicians (or, in the case of the Academy, that it has members who are California physicians) who have patients with terminal diseases within the meaning of the Act.  "They bring this action to protect the rights of their patients to be protected by 1aw . . . from being assisted and abetted in committing suicide, from receiving substandard medical care, and from having depression and medical conditions leading to suicide left untreated."

The Academy additionally alleged that it "promote[s] ethical standards in the medical profession" and "lobbies for ethical government policy consistent with the Hippocratic tradition of preserving life."

The State responded with a general denial of these (and all other) allegations of the complaint.  Moreover, in opposition to the motion for judgment on the pleadings, it argued that the Ahn parties lacked standing.

The trial court ruled that the Ahn parties did have standing:  "[W]here a constitutional challenge is involved, a party whose own rights are not impacted, but whose challenge is raised on behalf of absent third parties, has sufficient standing if the relationship between the litigant and the absent third party whose rights the litigant asserts is so close that the litigant is fully or very nearly as effective a proponent of the

11

right as would be the absent party, and there are obstacles to prevent the third parties from bringing suit themselves.

"The plaintiffs in this case are doctors whose actions are not only covered under the Act, but who have a close enough relationship to their patients to bring them within the ambit of the Act.

"Furthermore, the Act impacts terminally ill patients who are not in a position to challenge the law because their illnesses and their shortened life expectancy present significant obstacles in bringing suit themselves."

B.      *Discussion*.

1.      *General standing principles*.

Justiciability has several aspects, including ripeness, mootness, and standing. (*Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1221-1222.)

"[S]tanding concerns a specific party's interest in the outcome of a lawsuit. [Citations.]  We . . . require a party to show that he or she is sufficiently interested as a prerequisite to deciding, on the merits, whether a party's challenge to legislative or executive action independently has merit.  [Citation.]"  (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247-1248.)  "Standing is a threshold issue necessary to maintain a cause of action, and the burden to allege and establish standing lies with the plaintiff.  [Citations.]"  (*Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 810.)

"'As a general principle, standing to invoke the judicial process requires an actual justiciable controversy as to which the complainant has a real interest in the ultimate adjudication because he or she has either suffered or is about to suffer an injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented to the adjudicator. [Citations.] To have standing, a party must be beneficially interested in the controversy; that is, he or she must have "some special interest to be served or some particular right to be preserved and protected over and above the interest held in common with the public at large." [Citation.] The party must be able to demonstrate that he or she has some such beneficial interest that is concrete and actual, and not conjectural or hypothetical.' [Citation.]" (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 599, italics in original.)

Subject to exceptions not applicable here (e.g., Code Civ. Proc., § 526a), "[t]o obtain an injunction, a party must show injury *as to himself*." (*Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739, 748, italics in original.) Likewise, where declaratory relief is sought, there must be an "actual controversy relating to the legal rights and duties *of the respective parties*." (Code Civ. Proc., § 1060, italics added.) "[T]he fact that an issue raised in an action for declaratory relief is of broad general interest is not enough for the courts to grant such relief in the absence of a true justiciable controversy [citations]." (*Winter v. Gnaizda* (1979) 90 Cal.App.3d 750, 756 [citing *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16];

13

accord, *Zetterberg v. State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 662 [same].)

"[M]ootness is not a jurisdictional defect." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 36.) In any event, the mootness doctrine itself includes an exception. "'"[I]f a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot." [Citation.] . . .' [Citation.]" (*Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 172.)

By contrast, "'[c]ontentions based on a lack of standing involve jurisdictional challenges . . . .' [Citations.]" (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 233; accord, *Associated Builders and Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 438-439. Or, to put it another way, "[a] 'lack of standing' is a jurisdictional defect." (*Hudis v. Crawford* (2005) 125 Cal.App.4th 1586, 1592.)

There is no general "public interest" exception to the requirement of standing. In *People ex rel. Lynch v. Superior Court* (1970) 1 Cal.3d 910, the attorney general sought a declaration that the state's prejudgment attachment laws were unconstitutional. (*Id*. at p. 911.) The Supreme Court held that he lacked standing, despite the public interest in the issue, and that this was a jurisdictional defect: "In the present proceeding, . . . there is before us no alleged debtor or creditor who is party to a prejudgment attachment of any

property whatsoever, wages or otherwise, and who seeks relief with respect thereto. The Attorney General avers that 'The various clerks, sheriffs, and marshals of the State of California (who issue and serve writs of attachment) . . . wish to be advised as to what the law is in the State of California' with reference . . . to California's prejudgment attachment procedures. . . . [¶] The rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court. [Citations.]" (*Id*. at pp. 911-912, fn. omitted; accord, *Younger v. Superior Court* (1978) 21 Cal.3d 102, 119-120.)

We recognize that "[u]nlike the federal Constitution, our state Constitution has no case or controversy requirement imposing an independent jurisdictional limitation on our standing doctrine. [Citation.]" (*Weatherford v. City of San Rafael*, *supra*, 2 Cal.5th at pp. 1247-1248.) As a result, it is not unconstitutional to extend broad "public interest" standing in mandate cases (as we discuss further in part V.B.3.c, *post*). (*Id*. at p. 1248.) "Notwithstanding the arguments for broad 'public interest' standing, though, [the Supreme Court] ha[s] continued to recognize the need for limits" in other cases. (*Ibid*.) A general "public interest" exception to standing requirements would turn us into a super-legislature, able to overturn a statute enacted by the People's duly elected representatives, despite the absence of any parties who can show that they are being harmed.

It has been said that "[i]f the issue of justiciability is in doubt, it should be resolved in favor of justiciability in cases of great public interest. [Citations.]" (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 432, fn. 14.) A court cannot

resort to this rule, however, when it has no doubt that standing is absent. Thus, in *California Water & Telephone Co. v. County of Los Angeles*, *supra*, 253 Cal.App.2d 16, after a somewhat lengthy discussion, the court concluded that the plaintiff water utilities (*id*. at p. 20) had standing to challenge the validity of a county ordinance regulating water services and facilities and making violations a misdemeanor (*id*. at pp. 20-21). (*Id*. at pp. 22-26.) Only then did it add, "[E]ven aside from the interest which respondents have in a determination of the validity of the Water Ordinance, the public interest requires that there be an adjudication to settle the constitutional question here presented. . . . Were there any doubt about the justiciability of the controversy, that doubt would be resolved in favor of present adjudication, because the public is interested in the settlement of the dispute. [Citations.]" (*Id*. at p. 26.) We are unaware of any case holding that the plaintiff did, in fact, lack standing yet allowing the action to proceed based solely on the public interest.

The dissent cites *Collier v. Lindley* (1928) 203 Cal. 641 as such a case; we disagree. In *Collier*, a charitable trust provided, "'In the event that this instrument does not create a valid, charitable trust, or, if it be finally adjudicated that any purpose set forth herein be invalid, the sum of $500 out of the *corpus* of the estate shall belong to, and be forthwith paid to, John Collier.'" (*Id*. at p. 644.) Collier and other interested parties (the opinion does not clearly indicate who these parties were, but presumably they were trustees and/or beneficiaries under the trust) agreed to submit the case, on a set of agreed

16

facts, without trial, for a declaratory judgment regarding the validity of the trust under Code of Civil Procedure sections 1138-1140. (*Collier v. Lindley*, *supra*, at p. 644.)

The Supreme Court described the suit as "an endeavor on the part of [the trustors] to procure a final ruling of the courts upon the validity . . . of [the] trust . . . ." (*Collier v. Lindley*, *supra*, 203 Cal. at pp. 643-644.) "The provision for the payment to [Collier] of the sum of $500 conditioned upon said trust or some portion thereof being invalid is nothing more not less than a thinly veiled attempt to engage the attention and compel the labors of the several courts of record of this state in order to effectuate a judicial determination of the validity or invalidity of said trust at once and in advance of any real contest or controversy between the parties in interest therein over its properties or provisions, and as such we hold it to be in plain violation of the spirit and intent of the sections of the Code of Civil Procedure above referred to, as well as of the general principle that courts should only be employed in the adjudication of actual as distinguished from moot questions and controversies when these are brought before them in the regular and orderly course of litigation by those parties only who are directly interested in their adjudication." (*Id*. at pp. 644-645.) It concluded, "[W]e would have no hesitation in . . . ordering a dismissal of this appeal but for the fact that there are certain questions of public interest which are involved therein and which arise entirely apart from the interest of the parties to the immediate proceeding." (*Id*. at p. 645.)

There seems to have been no dispute that, if Collier succeeded in invalidating the trust, he would, in fact, receive $500. (See *Collier v. Lindley*, *supra*, 203 Cal. at p. 644.)

17

This would appear sufficient to give him standing. The Supreme Court's concern was that the case was collusive — that it had been cooked up between the trustors and Collier, especially in light of their submission of the case on agreed facts. Indeed, the Supreme Court later cited *Collier* as a example of a "collusive" suit. (*City and County of S.F. v. Boyd* (1943) 22 Cal.2d 685, 694.) Thus, *Collier* is not authority for the proposition that there is a general public interest exception to the standing requirement. We note, however, that even if it were, it was implicitly overruled by the later cases cited above.

Finally, we must be "guided by the familiar principle . . . that 'we do not reach constitutional questions unless absolutely required to do so to dispose the matter before us.' [Citation.]" (*Facebook, Inc. v. Superior Court* (2018) 4 Cal.5th 1245, 1275, fn. 31.)

In sum, then, if the Ahn parties lack standing, we cannot, should not, and will not reach the ultimate constitutional question.

2. *The effect of the State's general denial.*

Preliminarily, the trial court should have denied judgment on the pleadings for the simple reason that the State had denied all of the Ahn parties' allegations. "A plaintiff's motion for judgment on the pleadings is analogous to a plaintiff's demurrer to an answer and is evaluated by the same standards. [Citations.] The motion should be denied if the defendant's pleadings raise a material issue or set up affirmative matter constituting a defense; for purposes of ruling on the motion, the trial court must treat all of the defendant's allegations as being true. [Citation.]" (*Allstate Ins. Co. v. Kim W.* (1984) 160 Cal.App.3d 326, 330-331, italics omitted.) Here, the State denied all of the Ahn

18

parties' allegations, including as to standing. The trial court had to accept this denial as true. This alone should have precluded judgment on the pleadings.

### 3. *The Ahn parties' allegations regarding standing.*

The Ahn parties also lack standing for a more fundamental reason: They did not allege it adequately in their complaint.

#### a. *Third-party standing.*

The allegations of the complaint are clearly intended to assert third-party standing. Moreover, the trial court ruled that the Ahn parties had standing on this theory.

"As a general rule, a third party does not have standing to bring a claim asserting a violation of someone else's rights. [Citation.]" (*Brenner v. Universal Health Services of Rancho Springs, Inc.* (2017) 12 Cal.App.5th 589, 605.) However, an exception to this general rule applies when "'(1) the litigant suffers a distinct and palpable injury in fact, thus giving him or her a concrete interest in the outcome of the dispute; (2) the litigant has a close relationship to the third party such that the two share a common interest; and (3) there is some hindrance to the third party's ability to protect his or her own interests. [Citations.]' [Citation.]" (*Yelp Inc. v. Superior Court* (2017) 17 Cal.App.5th 1, 7; accord, *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 674-677; *Novartis Vaccines & Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2006) 143 Cal.App.4th 1284, 1297-1298.)

For example, in *Lewis v. Superior Court* (2017) 3 Cal.5th 561, the State Medical Board, as part of its investigation of a doctor, obtained his patients' prescription records

from a centralized database. (*Id.* at pp. 565-567.) The Supreme Court held that the doctor had standing to assert that this was a violation of his patients' state constitutional right to privacy. (*Id.* at pp. 569-571.) It explained that "'[w]here the constitutionally protected privacy interests of absent patients are coincident with the interests of the doctor, the doctor must be permitted to speak for them.' [Citation.]" (*Id.* at p. 570.) It reasoned, in part, that the doctor's interests were not "at odds with his patients' interests." (*Ibid.*)

Here, the requisite commonality of interest is missing. The Ahn parties' terminally ill patients may be divided into two groups. One group, upon receiving their diagnosis, will want to request assisted suicide. The Ahn parties, however, brought this action to prevent them from doing so. They cannot possibly "speak for" this group of patients, even if they claim to be doing so for their benefit. The other group will not want to request assisted suicide. In that event, however, all they have to do is not request it. The Act simply does not affect them; thus, it also does not affect the Ahn parties.

The State sums this up well in its petition: "If neither the real party physicians nor their patients want aid-in-dying to be a part of their professional relationship, then neither group suffers any injury due to the Act. Alternatively, if the real party physicians do not want to provide aid-in-dying, but their patients do want aid-in-dying, the physicians' interests are not aligned with those of their patients and third-party standing would not lie."

20

b.    *Personal standing.*

The Ahn parties also argue that they have personal standing, on three theories.

First, they claim that they "regularly" diagnose terminal diseases.  They claim that, if they diagnose a patient as having a terminal disease, "that make[s] th[e] patient[s] eligible to receive fatal drugs."  They argue that this impacts their "professional obligations and duties to clients."

One problem with this argument is that the Ahn parties did not allege that they regularly (or ever) diagnose terminal diseases.  Even assuming they do, however, it is simply not true that that diagnosis makes the patient eligible for an aid-in-dying drug.  The patient still has to jump through a number of hoops, and the Ahn parties are free to refuse to participate in that process.  Once they refuse, if the patient still wants an aid-in-dying drug, he or she must get a new attending physician, who must also diagnose the patient as having a terminal disease.  (Health & Saf. Code, § 443.5, subd. (a)(1)(B).)  Moreover, the attending physician must refer the patient to a consulting physician, and the consulting physician, too, must diagnose the patient as having a terminal disease.  (Health & Saf. Code, §§ 443.1, subd. (j), 443.5, subd. (a)(3), 443.6, subd. (b).)

At this point, the Ahn parties' responsibility for the patient's choice of assisted suicide is attenuated, at best.  We may assume that they would feel some reluctance to diagnose a patient as having a terminal disease, because one possible outcome is that the patient will start the assisted suicide process (albeit with a different attending physician).  Even so, there are many other reasons why a physician might be reluctant to diagnose a

21

terminal disease — not least, that the patient might choose to commit *unassisted* suicide. These "conjectural" and "hypothetical" possibilities do not give rise to standing.

Under the AMA Code of Medical Ethics, a physician has a duty to communicate an honest diagnosis: "Except in emergency situations in which a patient is incapable of making an informed decision, withholding information without the patient's knowledge or consent is ethically unacceptable." (Code of Medical Ethics Opinion 2.1.3.[6]). Compliance might make the Ahn parties feel bad, but they cite no authority for the proposition that bad feelings can be sufficient to confer standing.

Second, the Ahn parties argue that the Act requires them to allow their employees to provide information about assisted suicide and to provide referrals to other physicians for assisted suicide. They cite the following provisions of the Act on this point.

Health and Safety Code section 443.15 provides:

"[N]otwithstanding any other law, a health care provider may prohibit its employees . . . from participating in activities under this part while on premises owned or under the management or direct control of that prohibiting health care provider or while acting within the course and scope of any employment by, or contract with, the prohibiting health care provider." (Health & Saf. Code, § 443.15, subd. (a).)

However, the same section also provides:

"For purposes of this section:  [¶]  . . . [¶]  . . .

---

[6]    Available at <https://www.ama-assn.org/delivering-care/withholding-information-patients>, as of Nov. 27, 2018.

22

"'Participating, or entering into an agreement to participate, in activities under this part' does not include . . . : [¶] . . .

"(B) Providing information to a patient about this part.

"(C) Providing a patient, upon the patient's request, with a referral to another health care provider for the purposes of participating in the activities authorized by this part." (Health & Saf. Code, § 443.15, subd. (f)(3).)

In sum, then, this section *allows* a health care provider to prohibit its employees from "participating in activities under this part," while it carves out providing information and providing a referral from the definition of "participating in activities under this part." But just because something is not expressly allowed does not mean it is forbidden. What is absent is any general rule *against* prohibiting an employee from providing information or providing a referral. Admittedly, a *health care provider* cannot be subjected to any sanctions — including employment sanctions — for providing information or providing a referral. (Health & Saf. Code, §§ 443.14, subd. (c), 443.16, subd. (a).) However, the Ahn parties have not shown that the Act provides a similar safe harbor for the *employee* of a health care provider (unless the employee is also a health care provider).

In any event, even assuming the Act does require a health care provider to allow its employees to provide information and to provide referrals, the complaint fails to allege standing on this basis. It does not allege that the Ahn parties even *have* any employees,

23

much less that any of their employees are health care providers or that any of their employees want to provide information and referrals against their employers' wishes.[7]

Third, the Ahn parties argue that the Act is vague with respect to whether, once they refuse to participate in assisted suicide, they are required to refer the patient to a health care provider who will. That is incorrect. The Act specifically says that they cannot be sanctioned for not making such a referral. (Health & Saf. Code, § 443.14, subd. (e)(2).)

c.      *Public-interest standing*.

Finally, the Ahn parties argue that they have public-interest standing to sue to enforce a public duty.

In mandate cases, the Supreme Court has held that """"where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the [petitioner] need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the

---

[7]      Even assuming the Ahn parties can plead and prove standing on the theory that the Act restricts their ability to control their employees, we question the scope of the injunction they could obtain. It "is inconsistent with the very nature and purpose of injunctive relief . . . to extend a remedy beyond the context of the specific dispute which justifies that remedy." (*Planned Parenthood Golden Gate v. Garibaldi* (2003) 107 Cal.App.4th 345, 354.) "' . . . The parties seeking [an] injunction assert a violation of their rights; the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public.' [Citation.]" (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 878-879.) Thus, it would seem that the Ahn parties could be entitled to an injunction prohibiting Hestrin from prosecuting them (or perhaps from prosecuting anyone) under the Act for exercising prohibited control over their employees; however, they could not be entitled to an injunction prohibiting any enforcement of the Act whatsoever.

duty in question enforced."' [Citation.] . . . We refer to this variety of standing as 'public interest standing.' [Citation.]" (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 166.)

Public-interest standing, however, is available only in a mandate proceeding, not in an ordinary civil action. (*Reynolds v. City of Calistoga* (2014) 223 Cal.App.4th 865, 873-874.) Here, the complaint does not include a cause of action for a writ of mandate. It is hard to see how it could. A mandate petition must allege that the respondent is failing to perform a ministerial duty. (Code Civ. Proc., § 1085, subd. (a); *Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 765.) "'A ministerial duty is one that is required to be performed in a prescribed manner under the mandate of legal authority without the exercise of discretion or judgment.' [Citation.]" (*Cape Concord Homeowners Assn. v. City of Escondido* (2017) 7 Cal.App.5th 180, 189.)

The Ahn parties sought to enjoin District Attorney Hestrin "from recognizing any exceptions to the criminal law created by the Act . . . ." By virtue of his prosecutorial discretion, however, he has no ministerial duty to prosecute assisted suicide cases. "It is well established that where a prosecutor is vested with discretionary power in the investigation and prosecution of charges a court cannot control this discretionary power even by mandamus. [Citations.]" (*People v. Cimarusti* (1978) 81 Cal.App.3d 314, 322; accord, *Boyne v. Ryan* (1893) 100 Cal. 265, 267.)

The Ahn parties cite *City of Merced v. Merced County* (1966) 240 Cal.App.2d 763 for the proposition that a district attorney has a mandatory duty to enforce the law. There, the District Attorney of Merced County was seeking a declaration that the City Attorney of the City of Merced was responsible for prosecuting misdemeanors. (*Id*. at p. 764.) It was in that context that the court said, "the several district attorneys of the state, including the District Attorney of Merced County, have the specific duty to prosecute . . . violations of general laws. (Gov. Code, § 26500.) This duty is mandatory, and not discretionary." (*Id*. at p. 766.)[8] Government Code section 26500, however, states: "The public prosecutor . . . *within his or her discretion* shall initiate and conduct on behalf of the people all prosecutions for public offenses." (Italics added.) Thus, a district attorney's "mandatory" duty is to exercise his or her *discretion* to prosecute crimes. We may accept that, if a district attorney failed and refused to prosecute any crimes whatsoever, mandate might lie. Nevertheless, mandate cannot be used to compel a district attorney to exercise his or her prosecutorial discretion in any particular way. Thus, we see no way to construe the complaint as a mandate petition.

At oral argument, counsel for the Ahn parties argued that his clients must be deemed to have standing, because otherwise no one would have standing to seek a remedy for the asserted constitutional violation. They have not shown that this is so. While we need not exhaustively specify who would have standing to challenge the

---

**8** This statement was dictum, in any event, as nobody was trying to compel the district attorney to do anything.

26

constitutionality of the Act, it would seem that a district attorney who believes the Act is unconstitutional and who wants to prosecute persons who participate in assisted suicide would have standing. Similarly, a hospital or professional association that seeks to penalize health care providers under its jurisdiction who participate in assisted suicide would seem to have standing. (See Health & Saf. Code, § 443.14, subd. (c) ["a health care provider shall not be subject to civil, criminal, administrative, disciplinary, employment, credentialing, professional discipline, contractual liability, or medical staff action, sanction, or penalty or other liability for participating in this part," italics added].)

In sum, then, we conclude that the Ahn parties lack standing on any of the theories they have asserted in this appeal. We have no way of knowing whether, on remand, they will be able to amend their complaint so as to allege standing, whether the trial court will grant them leave to do so, or whether they will be able to prove up their amended allegations. It is possible (though by no means certain) that we will see this case again; if so, however, at least we will be sure that the constitutional issue is properly presented.

VI

DISPOSITION

Let a writ of mandate issue, directing the superior court to vacate its order granting the motion for judgment on the pleadings and to vacate the judgment. Our temporary stay is dissolved.

The State is directed to prepare the writ of mandate, to have it issued, to serve copies, and to file the original, with proof of service, with the clerk of this court. The

27

State is awarded its costs in this writ proceeding against the Ahn parties. (Cal. Rules of Court, rule 8.493, subd. (a).) Costs are not awarded for or against the Fairchild parties.

CERTIFIED FOR PUBLICATION

RAMIREZ  
　　　　　　　　　　　　　　　　　　　　　P. J.

[*People ex. rel. Becerra v. Superior Court; Ahn et al.*, E070545]

FIELDS, J., Concurring.

I fully concur in the majority opinion in this case. I write separately to further clarify my position as to why the matter should not be decided on the merits at this time and why remand is appropriate to allow the trial court to determine whether the real parties in interest, Sang-Hoon Ahn, Laurence Boggeln, George Delgado, Philip Dreisbach, Vincent Fortanasce, Vincent Nguyen, and the Christian Medical and Dental Society, d/b/a the American Academy of Medical Ethics (the Ahn parties) are able to demonstrate that they have standing to challenge the End of Life Option Act (EOLOA) (Health & Saf. Code, §§ 443-443.22) and that there is, therefore, a justiciable controversy for this court to determine.

First, as noted in the majority opinion, the trial court's grant of judgment on the pleadings for the Ahn parties was clearly erroneous and must be set aside. Such a motion "should be denied if the defendant's pleadings raise a material issue or set up affirmative matter constituting a defense . . . ." (*Allstate Ins. Co. v. Kim W.* (1984) 160 Cal.App.3d 326, 331.) In the instant case, the State's pleadings raised a material issue as to standing in that the State denied all the Ahn parties' material factual allegations, including their allegations regarding their standing to sue. The trial court was required to accept the State's denials as true. (*Ibid.*) Thus, the court was required to deny the motion solely on this basis alone. The Ahn parties acknowledged as much at oral argument.

1

Second, it is clear from the majority and concurring/dissenting opinions that the Ahn parties have failed to demonstrate standing. The concurring/dissenting opinion carefully demonstrates what the Ahn parties may plead to demonstrate a justiciable controversy; however, it is for the Ahn parties to make this threshold showing, which they have failed to do.

The concurring/dissenting opinion is correct in asserting that there is a hazard in judicial inaction. However, the majority opinion does not result in inaction. Rather, under the majority opinion, the trial court decision is vacated, leaving the EOLOA in effect. That law will remain in effect unless the Ahn parties are able to show a justiciable controversy and unauthorized acts by the Legislature. This posture is consistent with and comports with the presumption of constitutionality of laws passed in regular or special session referred to in the concurring/dissenting opinion. (*Martin v. Riley* (1942) 20 Cal.2d. 28, 39-40.)

We ought not go beyond the traditional rule requiring "a party to show that he or she is sufficiently interested as a prerequisite to deciding, on the merits, whether a party's challenge to legislative or executive action independently has merit" (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247) where, as here, the legislative enactment (the EOLOA) remains in effect and the Ahn parties have the opportunity to demonstrate their right to maintain an action challenging the constitutionality of the EOLOA.

In *Weatherford*, the court further stated that "[n]otwithstanding the arguments for broad 'public interest' standing . . . we have continued to recognize the need for limits [to

2

finding public interest standing] in light of the larger statutory and policy context" (*Weatherford*, *supra*, 2 Cal.5th at p. 1248) of the statute being challenged, and the "broader prudential and separation of powers considerations" (*ibid.*) weighing against public interest standing.  I believe these limits are particularly applicable here where the legislative enactment, the EOLOA, remains presumptively valid, the Ahn parties have the opportunity to demonstrate their standing to challenge the EOLOA, and all parties maintain the same rights they had at the inception of this action.

FIELDS

J.

3

[*People ex rel. Becerra v. Superior Court; Ahn et al.*, E070545]

Slough, J., Concurring and Dissenting.

My colleagues bypass the central and important question in this case—whether the Legislature exceeded its authority when it enacted the End of Life Option Act (EOLOA) to provide terminal patients facing prolonged painful deaths the option of obtaining drugs to shorten their suffering. (Health & Saf. Code, §§ 443-443.22, unlabeled statutory citations refer to this code.) They conclude we cannot reach the question because the plaintiffs haven't adequately pled standing. (Maj. opn. *ante*, at pp. 14-20.) I disagree.

In my view, the majority's approach needlessly ties this case up in a procedural Gordian knot. We can cut the knot by realizing the courts—both trial and appellate— have discretion to dismiss a cause of action on any decisive legal ground. In this case, the fact that plaintiffs' challenge to EOLOA lacks merit as a matter of law provides an independent basis for us to reverse the trial court judgment finding EOLOA violates article IV, section 3 of the California Constitution and direct the court to enter judgment in favor of the state on plaintiffs' third cause of action.

# I

## INTRODUCTION

I part ways with the majority on just about every principle point of their analysis. Because the issues they raise are complex and interrelated, I start with an overview of our disagreements.

1

First, the plaintiffs *have* pled standing. The majority reaches the contrary conclusion only by assuming all the plaintiff-physicians *as well as* all the members of plaintiff American Academy of Medical Ethics (the association) are conscientious objectors who will refuse to provide *any* aid-in-dying services. That proposition does not appear in the complaint. What the physicians *do* allege is they treat terminal patients and will inevitably harm them by following the regulations of their profession the Legislature enacted. Thus, the complaint successfully alleges some plaintiffs are *participating* physicians who have *direct* standing because EOLOA regulates the way they practice medicine to their detriment. Because plaintiffs also allege some of their patients are unable to protect their own interests in litigation due to their illnesses, they also successfully allege *third-party* standing. In addition, the association has alleged standing by alleging some of its members have standing.

Second, even if the complaint *were* concerned only with *nonparticipating* physicians whose practices EOLOA doesn't regulate because they refuse to participate at all, it is clear from the statute they would be able to amend to articulate standing on separate grounds. For example, the statute plainly bars nonparticipating physicians from controlling whether their employees share with their patients information about EOLOA or refer them to participating physicians. Thus, a nonparticipating physician who employs others cannot enforce an office policy requiring employees to run the business as a conscientious objector shop. Because an employer has an interest in being able to set such a policy, nonparticipating physicians will be able to allege direct standing to

2

challenge whether the Legislature exceeded its authority by enacting EOLOA during the special session.

Still, I conclude the trial court committed an elementary error when it found the plaintiffs had *established* standing, as it had to do to enter judgment in their favor. The trial court made its ruling on plaintiffs' motion for judgment on the pleadings. While I agree the plaintiffs had properly *alleged* standing, there was not yet any basis to conclude the plaintiffs in fact *have* standing. On the contrary, since the state specifically denied the standing allegations, that material issue was in dispute and could not be decided in favor of either party on a motion for judgment on the pleadings. Since plaintiffs were required to establish standing to prevail, the trial court could not properly *grant* plaintiffs' motion for judgment on the pleadings. Doing so was error. To that extent, I agree with the majority.

However, the *state* was *not* required to establish the plaintiffs had *no* standing to prevail. The trial court was therefore free to rule in *their* favor on the merits of the purely legal constitutional challenge to EOLOA. A trial court can set aside disputed standing issues to reach a dispositive legal issue at any stage of litigation—on a demurrer, a motion for judgment on the pleadings, or at summary judgment. Standing doesn't matter where the plaintiffs lose on independent grounds. And where those grounds are purely legal, the trial court may rule against plaintiffs even if their standing remains in dispute. The contrary rule offends both common sense and basic principles of judicial economy.

3

So, the trial court plainly could have—and as I will explain should have—ruled plaintiffs' challenge to EOLOA as ultra vires legislation failed as a matter of law.

This brings us to my third area of disagreement with the majority. Just as the trial court could have reached the merits of the constitutional challenge, we can too. The fact that standing remains in dispute (and may require additional pleading) isn't a barrier to our finding the legislation constitutional. We have the discretion to reach the substantive merits and rule in favor of the state parties. I would do so because we have a responsibility to expeditiously disperse the uncertainty this litigation has created for countless patients, family members, and loved ones, as well as physicians and workers in the health care sector.

There is simply no reason to drag this case out so the plaintiffs can prove they have standing before we hold the Legislature acted within its authority under the Governor's proclamation when it enacted EOLOA. For these reasons and the reasons I explain in detail in part IV below, I would do so now.

## II

## BACKGROUND

My colleagues set out selected provisions from EOLOA. However, I believe they leave out provisions which affect the analysis of both the standing and constitutional issues. I therefore provide additional background about the provisions of EOLOA and its passage here.

4

A. *The Proclamation and Special Legislative Session*

On June 16, 2015, Governor Brown issued a proclamation calling the Legislature to assemble in extraordinary session on June 19, 2015 and directing them to consider and enact legislation relating to the delivery of health care services in California. (Proclamation by the Governor of the State of California (proclamation) (June 16, 2015).) Among other things, the Governor directed the Legislature to "consider and act upon legislation necessary to [¶] . . . [¶] . . . [i]mprove the efficiency and efficacy of the health care system, reduce the cost of providing health care services, and improve the health of Californians." (*Id.* at p. 2.)

As the plaintiffs emphasize, the proclamation also directed the Legislature to consider and act on legislation on certain specific topics related to health care funding. The proclamation embraced legislation "necessary to enact permanent and sustainable funding from a new managed care organization tax and/or alternative fund sources to provide: [¶] . . . [a]t least $1.1 billion annually to stabilize the General Fund's costs for Medi-Cal; and [¶] . . . [s]ufficient funding to continue the 7 percent restoration of In-Home Supportive Services hours beyond 2015-16; and [¶] . . . [s]ufficient funding to provide additional rate increases for providers of Medi-Cal and developmental disability services." (Proclamation p. 1.) It also embraced legislation necessary to "[e]stablish mechanisms so that any additional rate increases expand access to services; and [¶] . . . [i]ncrease oversight and the effective management of services provided to consumers with developmental disabilities through the regional center system." (Proclamation p. 2.)

5

On September 9, 2015, during the special session, Assemblyperson Dr. Susan Eggman introduced to the California Assembly the bill (Assembly Bill X2 15) which became EOLOA. "Thank you, Mr. Speaker and members. I am very pleased to have the opportunity to present to you today, Assembly Bill X2 15. This bill is the product of an immense amount of work across both houses involving many legislators' close collaboration with stakeholders. The result, members, is the most rigorous aid-in-dying legislation in the country, with the strongest set of protections for patients and the physicians who treat them. At its most basic, this bill provides the option for a person who is terminally ill to request a prescription for medication to aid in their passing in their last days." Assemblyperson Eggman then summarized the provisions of the bill and asked the other Assembly members for their support.

Before the Assembly debated whether the bill represented good policy, Assemblyperson James Gallagher challenged it as outside the approved purposes for the special session. "This bill is not properly before this extraordinary session, as it is not consistent with the purpose stated for the extraordinary session, which is health care funding. This bill has nothing to do with funding health care and MediCal." The Speaker pro tempore (Speaker) pointed out the Rules Committee had referred the bill to the Assembly as consistent with Assembly rules, and ruled the bill is "germane to health care."

Assemblyperson Gallagher pressed his objection further. He appealed the decision and called for a vote on whether EOLOA was germane to the purposes approved

6

by the Governor.  He argued, "This extraordinary session was called for the specific purpose of finding funding for MediCal, and other health care issues for the developmentally disabled.  This bill is not consistent with the subject of this extraordinary session.  And I think it's incumbent upon all of us to ensure that we follow proper procedure.  This bill did go through in our regular session, and it didn't make it through the Committee process.  We need to respect that decision.  In the decision that was made in Health Committee and not allow the rules to be circumvented.  And so I would encourage all of you to overrule this ruling.  So that we can get back to the business that we've been working on and we can get back to the proper business of this extraordinary session."

The Speaker then called a vote of the Assembly to determine whether EOLOA was germane.  "Mr. Gallagher, as I indicated, the Rules Committee properly referred this bill.  It's germane to health.  I have cited my reasoning and my decision on your point of order.  The question before the body is a procedural one, and . . . the ruling of the Chair [should] be upheld.  This is procedural, members.  The clerk will open the role . . .  [T]his requires a majority of those present and voting."  The Assembly voted 41 to 28 to uphold the decision EOLOA was within the purposes of the proclamation.  The Assembly then turned to an extended debate on the policy of adopting aid-in-dying legislation, after which it voted 42 to 33 to enact EOLOA.[9]  The Legislature passed EOLOA on September 11, 2015.  (Assem. Weekly Hist., Apr. 4, 2016, p. 14.)  Governor Brown signed the bill

---

[9]  The entire floor debate is online at https://ca.digitaldemocracy.org/hearing/562.

on October 5, 2015, and it went into effect on June 9, 2016. (Stats. 2015-2016, 2d Ex. Sess., ch. 1; Assem. Weekly Hist., Apr. 4, 2016, p. 14; Assem. Con. Res. No. 1, 2015-2016 2d Ex. Sess.)

B. *The End of Life Option Act*

As enacted, EOLOA allows, but heavily regulates, the use of aid-in-dying drugs by patients diagnosed with a terminal disease. An aid-in-dying drug is any drug "determined and prescribed by a physician . . . which the qualified individual may choose to self-administer to bring about his or her death due to a terminal disease."[10] (§ 443.1, subd. (b).)

A patient is a qualified individual and may obtain a prescription for an aid-in-dying drug if they reside in California, have been diagnosed with a terminal disease, have the capacity to make medical decisions, voluntarily request a prescription, and have the physical and mental ability to self-administer the drug. (§§ 443.1, subd. (o); 443.2.) A terminal disease is "an incurable and irreversible disease that has been medically

---

[10] My colleagues prefer the term "assisted suicide," a choice opponents of the law also prefer. However, the Legislature explicitly directed "death resulting from the self-administration of an aid-in-dying drug *is not suicide*" (§ 443.13, italics added) and "[a]ctions taken in accordance with this part *shall not*, for any purposes, *constitute suicide . . . [or] assisted suicide*. (§ 443.18, italics added.) We should respect the Legislature's prerogative, not rely—as the majority does—on the dubious and shifting authority of keyword searches on Google and Wikipedia. (Maj. opn. *ante*, at p. 3, fn. 1.) Among other problems, those sources are inherently manipulable. "Aid-in-dying" is defined in the statute, whereas "assisted suicide" is a term in general currency, too broad to be of use in discussing EOLOA. For example, the statute explicitly prohibits "lethal injection, mercy killing, or active euthanasia," all of which are forms of "assisted suicide" if directed by the patient. (§ 443.18.)

confirmed and will, within reasonable medical judgment, result in death within six months." (§ 433.1, subd. (q).)

A patient's request for a prescription for an aid-in-dying drug must be repeated and take a specific form. The patient must make two oral requests, separated by at least 15 days, and one written request, all to their attending physician. (§ 443.3, subd. (a).) The written request must be in the form set out in section 443.11 and must be signed and dated in the presence of two witnesses. (§ 443.3, subd. (b)(1) & (2).) The witnesses must, among other things, attest they know the patient or have proof of the patient's identity and they believe the patient to be of sound mind and not acting under duress, fraud, or undue influence. (§ 443.3, subd. (b)(3).) Only one family member may serve as a witness, and no person serving as the attending physician, consulting physician, or mental health care specialist may do so. (§ 443.3, subds. (c)(1) & (d).)

The act heavily regulates the conditions under which an attending physician may prescribe an aid-in-dying drug. Before doing so, the physician must determine whether the patient is a qualified individual, has a terminal disease, has the capacity to make medical decisions, and has made a voluntary request using a form with required content. (§ 443.5, subd. (a).) Each of these conditions is delineated elsewhere in the statute. If the physician determines the patient shows indications of a mental disorder, they must refer the patient for a mental health specialist assessment. (§ 443.5, subd. (a)(1)(A)(i).) The physician must confirm the patient is making an informed decision by discussing the diagnosis and prognosis, potential risks and the probable result of ingesting the drug, the

9

possibility they may obtain the drug but not take it, and other treatment options like comfort care, hospice care, palliative care, and pain control. (§ 443.5, subd. (a)(2)(A)-(E).) They must also discuss with the patient whether they're feeling coerced or unduly influenced to confirm the decision was not the result of coercion. (§ 443.5, subd. (a)(4).)

The attending physician must then refer the patient to a consulting physician for a second opinion. (§ 443.5, subd. (a)(3).) The consulting physician must examine the patient and relevant medical records, confirm the attending physician's diagnosis and prognosis, and independently determine the patient has the capacity to make medical decisions, is acting voluntarily, and has made an informed decision. (§ 443.6, subds. (a)-(c).) Like the attending physician, the consulting physician must refer the patient for a mental health specialist assessment if they show indications of a mental disorder. (§ 443.6, subd. (d).)

If either physician refers the patient to a mental health specialist, the specialist must examine the patient and relevant medical records and independently determine whether the patient has the capacity to make medical decisions, act voluntarily, and make informed decisions. (§ 443.7, subds. (a) & (b).) Further, the mental health specialist must determine whether the individual is suffering from impaired judgment due to a mental disorder. (§ 443.7, subd. (c).)

Various additional provisions protect patients from being coerced into requesting or taking an aid-in-dying drug. Contractual provisions are not valid if they affect whether a person may make, withdraw, or rescind a request for an aid-in-dying drug. (§ 443.12.)

10

Policies for life insurance, health insurance, or annuities, as well as health care service and health benefit plans may not be conditioned upon or affected by a person making or rescinding a request for an aid-in-dying drug. (§ 443.12, subd. (a).) Insurance carriers are not permitted to provide information to individuals about the availability of an aid-in-dying drug unless the insured has requested the information, either personally or through their attending physician. (§ 443.13, subd. (c).) A patient's attending physician, consulting physician, and mental health specialist may not be "related to the individual by blood, marriage, registered domestic partnership, or adoption, or be entitled to a portion of the individual's estate upon death." (§ 443.17, subd. (d).)

The statute also bars outright coercion or fraud. "Knowingly altering or forging a request for an aid-in-dying drug to end an individual's life without his or her authorization or concealing or destroying a withdrawal or rescission of a request for an aid-in-dying drug is punishable as a felony if the act is done with the intent or effect of causing the individual's death." (§ 443.17, subd. (a).) "Knowingly coercing or exerting undue influence on an individual to request or ingest an aid-in-dying drug for the purpose of ending his or her life or to destroy a withdrawal or rescission of a request, or to administer an aid-in-dying drug to an individual without his or her knowledge or consent, is punishable as a felony." (§ 443.17, subd. (b).)

If the patient satisfies all the statutory conditions, the attending physician may prescribe an aid-in-dying drug to the patient. (§ 443.5, subd. (b).) The patient may then self-administer the drug. (§§ 443.1, subd. (b); 443.13, subd. (a)(2); 443.14, subd. (a).)

11

Physicians and other health care providers who provide services under EOLOA are immune from all forms of liability and discipline, including discipline as an employee or independent contractor, as I discuss in more detail in the part III.B. below, so long as they act professionally. (§§ 443.14, subd. (c); 443.16, subd. (c).)

However, health care providers are free to abstain from providing services under EOLOA. (§ 443.14, subd. (e)(1).) And if they are conscientious objectors, health care providers are immune from liability and discipline for refusing to participate in EOLOA services, including for "refusing to inform a patient regarding his or her rights under this part, and not referring an individual to a physician who participates in activities authorized under [EOLOA]." (§ 443.14, subd. (e)(2).)

C. *The Constitutional Challenge to EOLOA*

The day before EOLOA was to take effect, June 8, 2016, the plaintiffs filed a complaint against the District Attorney of Riverside County seeking declaratory and injunctive relief. They asserted three causes of action. The first and second causes of action alleged EOLOA violates principles of equal protection and due process under the state constitution by removing protections for terminal patients that apply to everyone else and creating a process that can lead to waiver of the fundamental right to life without adequate procedural protections. (Cal. Const., art. I, § 7.) The third cause of action alleged the Legislature acted beyond the power granted by the Governor's proclamation when it enacted EOLOA. (Cal. Const., art. IV, § 3.) As relief, they asked for a declaration that EOLOA is unconstitutional and an injunction against the Riverside

12

County District Attorney from recognizing exceptions to the criminal law enacted as part of EOLOA.[11]

Only plaintiffs' claim that the Legislature acted beyond its authority in passing EOLOA during the special legislative session is at issue in this appeal. The trial court granted plaintiffs' motion for judgment on the pleadings on that claim. First, it held the plaintiffs had standing to bring the challenge. "The plaintiffs in this case are doctors whose actions are not only covered under the Act, but who have a close enough relationship to their patients to bring them within the ambit of the Act" and, in addition, "the Act impacts terminally ill patients who are not in a position to challenge the law because their illnesses and their shortened life expectancy present significant obstacles in bringing suit themselves."

On the constitutional challenge, the trial court ruled for plaintiffs as a matter of law. "[T]he End of Life Option Act ('Act') was passed by a special session of the Legislature in violation of Article IV § 3(b) of the California Constitution because the Act is not encompassed by any 'reasonable construction' of the Proclamation granting the special session the authority to legislate." The court then entered judgment for plaintiffs, permanently enjoining the state from recognizing or enforcing EOLOA and the District Attorney from recognizing exceptions to the criminal laws EOLOA had created.

---

[11] The Attorney General of the State of California by and through the California Department of Public Health filed a complaint-in-intervention on June 27, 2016. The Riverside County District Attorney, Michael Hestrin (District Attorney), filed an answer on September 23, 2016 (Answer). The Answer is not in the record on appeal, but is subject to judicial notice. (Evid. Code, § 452.)

The equal protection and due process claims were queued up for trial at the time the trial court ruled on the Legislature's authority to enact EOLOA, and the trial court did not address them in its ruling.

## III

## STANDING

The majority develops two arguments for why the trial court erred by holding the pleadings establish plaintiffs have standing. One is the complaint fails to allege any form of standing—personal, third party, associational, or public interest.[12] (Maj. opn. *ante*, at pp. 19-27.) The other is the state parties' general denial of plaintiffs' allegations put the issue of standing in dispute, precluding judgment on the pleadings in plaintiffs' favor. (Maj. opn. *ante*, at pp. 18-19.) I disagree with my colleagues because they read the complaint too narrowly and, even assuming their narrow interpretation were correct, place far too much importance on the standing question.

A. *Plaintiffs Who Are Participating Physicians Pled Standing*

I believe the majority is simply wrong about the adequacy of plaintiffs' complaint on standing. The individual plaintiffs allege they "are physicians who treat patients meeting the Act's definition of having a terminal disease. They bring this action to protect the rights of their patients to be protected by law . . . and from being assisted and abetted in committing suicide, from receiving substandard medical care, and from having depression and mental conditions leading to suicide left untreated." The association

---

[12] Though the majority doesn't address the association's standing directly.

14

plaintiff alleges it "represents thousands of member doctors and health-care professionals nationwide" including "California physicians whose patients meet the Act's definition of having a terminal disease."

These allegations, if proven, would establish the individual members and some association members are physicians whose conduct is regulated by the newly enacted provisions of EOLOA. The physicians practice medicine in California and treat terminal patients. EOLOA heavily regulates the practice of medicine in California as it affects such patients and their physicians. To start, the act defines "terminal disease" narrowly as "an incurable and irreversible disease that has been medically confirmed and will, within reasonable medical judgment, result in death within six months." (§§ 433.1, subd. (q); 443.5, subd. (a).) The provision therefore regulates the physician-patient relationship at the outset simply by classifying some patients as terminal and others as nonterminal.

For patients who satisfy the definition and request an aid-in-dying drug, EOLOA's regulations pervade the physician-patient relationship. Before a physician can prescribe an aid-in-dying drug, they must determine whether the patient has the capacity to make medical decisions and has made a voluntary request in an approved form. (§ 443.5, subd. (a).) They must determine whether the patient shows indications of a mental disorder, and if so refer them for a mental health assessment. (§ 443.5, subd. (a)(1)(A)(i).) They must confirm the patient is making an informed decision by discussing the diagnosis and prognosis, potential risks of the drug, advise about other treatment options, and discuss with the patient whether they're feeling coerced or unduly influenced to confirm the

15

decision was not the result of coercion. (§§ 443.5, subd. (a)(2)(A)-(E); 443.5, subd. (a)(4).) In the end, they must refer the patient for a second opinion. (§ 443.5, subd. (a)(3).)

In simple terms, the new legislation directly regulates the medical practice of any plaintiff-physician who treats terminal patients and participates in providing aid-in-dying services. The existing allegations are therefore sufficient to satisfy any obligation the plaintiffs had to plead personal standing. (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 26 (*California Water*) ["Respondent's interest in obtaining a declaration respecting the validity of the Water Ordinance is neither academic or remote. The constitutional amenability of the public utilities to the local regulations prescribed by the Water Ordinance has a continuing effect upon the conduct of respondents' business. That the impact of the ordinance is not necessarily immediate does not make respondents' interest in the adjudication remote"].)

The majority's opposite conclusion relies entirely on the assumption that *all* the plaintiff-physicians will refuse to provide *any* aid-in-dying services and instead will take advantage of the provisions that allow them to abstain from providing services under EOLOA. (§ 443.14, subd. (e)(1); see also § 443.14, subd. (e)(2).) But the complaint does not allege the plaintiffs are conscientious objectors, nor do the provisions that allow and protect conscientious objectors appear in the complaint.

The majority's assumption is most clearly on display when they quote approvingly from the state's petition to show the physician-plaintiffs have not pled third-party

16

standing as representatives of their patients. "'If neither the real party physicians nor their patients want aid-in-dying to be a part of their professional relationship, then neither group suffers any injury due to the Act. Alternatively, if the real party physicians do not want to provide aid-in-dying, but their patients do want aid-in-dying, the physicians' interests are not aligned with those of their patients and third-party standing would not lie.'" (Maj. opn. *ante*, at p. 20.) Framing the issue this way obscures the fact the physician-plaintiffs are objecting to, among other things, the *way* they are required to deliver aid-in-dying services under EOLOA. And it ignores the allegations saying they seek to avoid being complicit in harming patients who ask for prescriptions for aid-in-dying drugs, but who should not and would not do so under a better regulatory regime.

On appeal from a judgment on the pleadings, we assume the truth of the allegations and liberally construe all properly pled factual allegations in the complaint. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1232; *Southern California Edison Co. v. City of Victorville* (2013) 217 Cal.App.4th 218, 227.) "When liberally construing allegations, a reviewing court also assumes the truth of all facts that may be inferred reasonably from (1) the facts pled, (2) the facts contained in exhibits to the complaint, and (3) the facts that are judicially noticed." (*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1402.) Moreover, a complaint may set out alternate theories and even inconsistent allegations. (*Ibid.*) The majority's approach violates these principles by construing the allegations narrowly and discounting facts the allegations obviously imply.

17

For example, the plaintiffs allege "predicting life expectancy is crude and fraught with subjective judgment . . . [and] predictions for life-expectancy are frequently wrong, and often extremely so." It is reasonable to infer from this allegation that plaintiffs believe EOLOA's definition of terminal disease places them at risk as the physicians of people diagnosed with terminal diseases of prescribing aid-in-dying drugs to patients who are "terminal" only in the statutory sense, and that they will therefore wrongly hasten the death of patients, a harm to themselves as doctors and, obviously, to their patients.

The plaintiffs also allege EOLOA's provisions put them at risk of prescribing aid-in-dying drugs to patients who are suffering from illness-induced depression. "Most persons who commit suicide do so as a result of depression, but most physicians are not specially trained in diagnosing depression. Indeed, participating physicians need not be qualified or trained to evaluate or determine whether an individual is burdened by mental impairment. Nevertheless, the Act requires that prescribing physicians determine whether a [patient with a terminal disease] has any 'indications of a mental disorder.' For most [such patients], the participating physician's determination, requiring no assessments, evaluations, questionnaires, or medical history on depression, anxiety or other mental disorders, will be their only mental health assessment before being given lethal drugs intended to end their lives." Because "[j]udgment-impairing depression and anxiety disorders, which are common among individuals deemed terminally ill, are frequently impossible to detect absent in-depth psychiatric evaluation," the act's provisions make it likely they will, as physicians treating terminal patients, prescribe aid-

18

in-dying drugs to patients who made their decisions out of illness-induced and temporary depression, causing them to wrongly hasten the death of their patients—again, an injury to the physicians and their patients.

Those interests, if proven, would give physicians who are providing aid-in-dying services standing to challenge EOLOA as ultra vires legislation. Because plaintiffs also allege they have terminal patients and such patients are not able to safeguard their own interests due to their illnesses, the same allegations, if proven, would give them third-party standing. (*Yelp Inc. v. Superior Court* (2017) 17 Cal.App.5th 1, 7.) Finally, since the association alleges it has such member physicians, the physicians' interests are germane to the association's purpose, and neither the claim nor the relief requires the participation of the individual members, the allegations, if proven, would give it associational standing. (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1004; see also *Warth v. Seldin* (1975) 422 U.S. 490, 515 ["If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"].)

It's true the complaint also implicitly alleges *nonparticipating* physicians are injured by EOLOA. But it is not proper for us to choose between the plaintiffs' theories and dismiss a cause of action because the pleadings related to one theory are deficient. We must instead construe the complaint to encompass both, even if the theories are inconsistent and could only be true in the alternative. (*Adams v. Paul* (1995) 11 Cal.4th

19

583, 593.) That's not the case here. Six individual plaintiff-physicians and a plaintiff-association with numerous member-physicians challenge EOLOA's constitutionality. Discovery may ultimately show some of those physicians are pure conscientious objectors, whereas others continue to serve their terminal patients and prescribe aid-in-dying drugs despite their qualms. On the other hand, discovery may show—as the majority assumes—that all the physicians are conscientious objectors, which would limit the theories plaintiffs could pursue at trial. In any event, we cannot make that decision on the pleadings; if the case is to go forward we must allow the plaintiffs to develop both theories in discovery.

B.  *Nonparticipating Physicians Can Plead Standing*

I also believe the main opinion misinterprets provisions of the statute which nonparticipating physicians point to as giving them standing.  Ultimately, I conclude the complaint fails to articulate these theories.  I write separately because I believe the main opinion's analysis muddies the waters and to explain why I do not believe the majority should make so much out of the pleading problem.

Justice Fields indicates his agreement with my statutory analysis.  (Conc. opn. *ante*, at p. 2 ["The concurring/dissenting opinion carefully demonstrates what the Ahn parties may plead to demonstrate a justiciable controversy"].)  So, to the extent the main opinion disagrees, that position is not part of the majority holding, and the plaintiffs are free to seek leave to amend along the lines I outline, provided such allegations have factual support.

Plaintiffs could establish standing based on the fact EOLOA stops them from controlling whether their employees or independent contractors tell terminal patients about the availability of aid-in-dying services or refer them to participating physicians.  The statute plainly forbids principal-physicians from disciplining their health care provider employees and independent contractors for providing terminal patients information about their EOLOA rights or referring them to physicians who are willing to provide aid-in-dying services.  "[A] health care provider shall not be subject to . . . employment [or] . . . contractual liability, . . . sanction, or penalty or other liability for participating in this part, including, but not limited to, . . . providing information to an

21

individual regarding this part, and providing a referral to a physician who participates in this part." (§ 443.14.) If that weren't clear enough, a later provision is even more explicit. "A health care provider may not be sanctioned for . . . [¶] . . . [¶] . . . [p]roviding information about the End of Life Option Act to a patient upon the request of the individual . . . [or] [¶] . . . [p]roviding an individual, upon request, with a referral to another physician." (§ 443.16.) These two provisions establish a principal-physician can do nothing if a health care provider they employ or contract with provides information or referrals under EOLOA to patients who have a terminal disease.[13]

The statute *does* allow nonparticipating health care providers to "prohibit its employees, independent contractors, or other persons or entities, including other health care providers, from *participating* in activities" related to aid-in-dying services while acting within the scope of their employment. (§ 443.15, subd. (a), italics added.) But the statute limits such "[p]articipating . . . in activities" to serving as an attending physician, a consulting physician, a mental health specialist, a person providing the aid-in-dying drug or prescription, or being present when a person takes the drug. (§ 443.15, subd. (f)(2)(A)-(E), respectively). So, a nonparticipating physician *can* direct their employees and independent contractors, including those who are health care providers, not to serve in any of those roles while on the job.

---

[13] The same provisions bar an employer or principal from sanctioning heath care providers who diagnose patients with a terminal disease. (§§ 443.14; 443.16.)

22

However, the statute does not allow nonparticipating physicians to silence their employees and independent contractors when it comes to providing information and making referrals.  On the contrary, the same provision allowing them to limit their employees and contractors from filling certain roles, specifically *excludes* providing information and referrals from the principal's right of control.  Section 443.15 bars principal-physicians from ordering employees and contractors to withhold information from terminal patients about their options under EOLOA.  (§ 443.15, subd. (f)(3)(B).)  It also bars principal-physicians from ordering employees and contractors to refuse to refer terminal patients to health care providers who are not conscientious objectors.  (§ 443.15, subd. (f)(3)(C).)  Taken together, all these provisions (§§ 443.14; 443.15; 443.16) create a safety valve to make it less likely patients with terminal diseases will be shut off from treatment permitted under EOLOA simply because they chose a physician who objects to aid-in-dying services.  Notwithstanding the principal-physician's scruples, an employee or contractor may inform the patient of her rights under EOLOA and refer her to a physician who is not a conscientious objector.

Indeed, under section 443.16, subdivision (b), an employee or contractor may even serve as an attending physician, consulting physician, a mental health specialist, a person providing the aid-in-dying drug or prescription, and be present when a person takes the drug, so long as they are acting outside their relationship with the conscientious objector.  "A health care provider that prohibits activities under this part in accordance with Section 443.15 shall not sanction an individual health care provider for contracting with a

23

qualified individual to engage in activities authorized by this part if the individual health care provider is acting outside the course and scope of his or her capacity as an employee or independent contractor of the prohibiting health care provider."  (§ 433.16, subd. (b).)

These provisions obviously represent a policy choice by the Legislature.  They chose to give conscientious objectors the right to opt out of providing services under EOLOA.  But they judged it necessary to ensure patients would not be blocked from receiving aid-in-dying services simply because they elected a nonparticipating physician earlier in treatment.  The Legislature accomplished this end by expressly limiting the powers of nonparticipating physicians to control their employees and independent contractors.  They may direct their health care professionals not to act to deliver aid-in-dying services, but they cannot direct their employees (including doctors and nurses) not to diagnose terminal illnesses, provide information about aid-in-dying services, or refer patients to other health care providers who provide such services.[14]  Nor may they bar their health care professionals from contracting to provide aid-in-dying services elsewhere.  Thus, the Legislature let physicians and health care businesses choose to be conscientious objectors, but also ensured their terminal patients could obtain information and referrals by limiting the objectors' control over their employees and contractors.

---

[14]  EOLOA defines "[h]ealth care provider" as "any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code; any person licensed pursuant to the Osteopathic Initiative Act or the Chiropractic Initiative Act; any person certified pursuant to Division 2.5 (commencing with Section 1797) of this code; and any clinic, health dispensary, or health facility licensed pursuant to Division 2 (commencing with Section 1200) of this code."  (§ 443.1, subd. (h).)

24

If plaintiffs in this case employ or contract with health care providers, these provisions obviously have a direct effect on how they are permitted to run their businesses. They can run a shop that refuses to provide aid-in-dying services, but they cannot direct their employees and contractors to refuse to promote or enable the delivery of aid-in-dying services for their patients. If that is the situation plaintiffs face, they can amend their pleadings to establish they have a direct interest in challenging EOLOA. (See *Garcetti v. Ceballos* (2006) 547 U.S. 410, 422-423 ["Employers have heightened interests in controlling speech made by an employee in his or her professional capacity . . . Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission"].)[15] That interest would be sufficient to give them standing to pursue their claim the legislation was ultra vires.[16]

The main opinion dismisses the import of these provisions because they provide a safe harbor only for "health care providers," but provide no "similar safe harbor for the

---

[15] Government employees have greater protections against employer control over their speech under the First Amendment. (*Garcetti v. Ceballos*, *supra*, 547 U.S. at p. 419 ["So long as [government] employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively"].)

[16] However, the same interest likely would not be sufficient for standing to pursue plaintiffs' equal protection and due process claims. (See *Estate of Horman* (1971) 5 Cal.3d 62, 77-78 ["To challenge the constitutionality of a statute on the ground that it is discriminatory, the party complaining must show that he is a party aggrieved or a member of the class discriminated against"].)

25

*employee* of a health care provider."[17]  (Maj. opn. *ante*, at p. 23.)  This is a non sequitur.

All nonparticipating physicians need to plead standing is they have some employees,

whether "health care providers" or not, whom they are barred from binding with a

conscientious objector policy.  A person can be a health care provider—which includes,

among other professionals, physicians, surgeons, psychiatrists, registered nurses, and

paramedics—*and* be an employee or independent contractor.  (§ 443.1, subd. (h).)

Sections 443.14 and 443.16 use the term "health care providers" instead of "employees

and contractors" because they apply beyond the employment and contracting context.

For example, they protect employers and principals, *as well as* employees and

contractors, from criminal prosecution, loss of credentials, discipline by professional

organizations, or removal from the medical staff of another health care institution.

(§ 443.14, subd. (c).)

    To put any remaining doubt to rest, section 443.16, subdivision (b) makes explicit

an "individual health care provider" may be employed by or contract with a "prohibiting

health care provider."  "A health care provider that prohibits activities under this part in

accordance with Section 443.15"—the provision allowing a principal to instruct

employees and contractors not to serve as, inter alia, attending or consulting physicians—

---

[17]  The majority hedges its analysis on this point, claiming the plaintiffs "have not shown" the act provides a safe harbor for employees.  But this is a question of statutory interpretation, which we determine independently.  (*People v. Scott* (2016) 3 Cal.App.5th 1265, 1272.)  The plaintiffs' evidence doesn't come into the matter.  The bottom line is the statute protects employees as a matter of law, and the plaintiffs adequately articulated this argument for standing (Return pp. 40-41), even if their pleadings do not spell it out.

"shall not sanction an *individual* health care provider for contracting with a qualified individual to engage in activities authorized by this part if the individual health care provider is acting outside of the course and scope of his or her capacity as an *employee or independent contractor* of the prohibiting health care provider." (§ 443.16, subd. (b), italics added.) There can be no question, in the face of this provision, that sections 443.14, 443.15, and 443.16 all protect at least physicians, surgeons, psychiatrists, and registered nurses who are employees and independent contractors from discipline or sanctions by their employers or principals. By putting these provisions in place, the Legislature has placed limits on how health care businesses of any size may treat their employees.

The main opinion comes close to the same conclusion when they write, "a hospital . . . that seeks to penalize health care providers under its jurisdiction who participate in assisted suicide would seem to have standing." (Maj. opn. *ante*, at p. 27, citing § 443.14, subd. (c).) But hospitals are not the only employers of health care providers. Since some individual physicians operate their own businesses and employ and contract with other physicians and nurses, the majority too is committed to finding plaintiffs in this case have standing if they would penalize health care providers in their employ who participate in providing aid-in-dying services. As I noted above, Justice Fields' concurrence indicates his agreement with this point.

So, all nonparticipating physicians would have to do to establish standing is plead they operate businesses providing services to patients who may qualify as terminal under

27

EOLOA and they would bar people who work for them from providing information or referrals related to aid-in-dying services.  Even the main opinion endorses the view that nonparticipating physicians can allege standing by pleading they employ or contract with other physicians, surgeons, psychiatrists, or nurses and would bar them from providing such information or referrals.

These points raise a second way the plaintiffs who are nonparticipating physicians are very likely to establish standing to challenge EOLOA as ultra vires legislation.  If plaintiffs operate their businesses as conscientious objectors, they will lose business to competing health care providers who provide aid-in-dying services.  The Legislature has effectively opened a new dimension of competition among health care providers who serve patients who may at some point in their treatment be diagnosed with a terminal disease.  Such patients will pursue many other treatment options before they are diagnosed with a terminal disease, and their physicians can provide such treatment whether they object to or approve of aid-in-dying services.  (See Amicus Brief of Andrea Saltzman at pp. 10-11 [discussing cancer treatments and patient-physician relationship before and after terminal diagnosis] and attached declaration at pp. 15-17 [same].)  But the moment a physician diagnoses a patient as terminal, the relationship changes for a patient interested in aid-in-dying services.  The attending physician is the person who would prescribe the aid-in-dying drug, and if that physician is a conscientious objector he or she may no longer be willing to continue serving as the patient's physician.  (*Ibid.*; see also § 443.1 [defining "attending physician" as "the physician who has primary

28

responsibility for the health care of an individual and treatment of the individual's terminal disease"].)

Changing doctors at that late stage of treatment would be disruptive, and for that reason it is a near certainty patients who care will choose compatible health care providers *long before* receiving a terminal diagnosis. For the same reason, other health care providers are unlikely to refer potential patients to a nonparticipating physician without disclosing that fact to the potential patient. That means nonparticipating physicians who regularly treat patients with terminal diseases will lose patients and business because of EOLOA, an interest sufficient to establish standing to challenge whether the Legislature was authorized to enact the legislation. (*California Water*, *supra*, 253 Cal.App.2d at p. 26.)

C. *The Trial Court Erred by Finding Plaintiffs Had Established Standing*

Despite these differences, I agree with my colleagues that the trial court erred when it found plaintiffs had established standing based on the pleadings.

Standing in this case is manifestly a factual question, not something a party could establish simply by pleading it. The trial court concluded "[t]he plaintiffs in this case are doctors whose actions are not only covered under the Act, but who have a close enough relationship to their patients to bring them within the ambit of the Act . . . [and] the Act impacts terminally ill patients who are not in a position to challenge the law because their illnesses and their shortened life expectancy present significant obstacles in bringing suit themselves." I agree these allegations were sufficient to plead standing, however,

29

alleging something doesn't make it true. Unless the state admitted or failed to contest the standing allegations, the trial court could not at the pleading stage make the ultimate determination that plaintiffs had established standing.

As it happens, the state parties did contest standing. Both the Attorney General and the District Attorney specifically denied plaintiffs' standing allegations on the ground they lacked information sufficient to form a belief as to their truth.[18] Belt and suspenders, the state parties also asserted the plaintiffs lack standing as an affirmative defense. The state's specific denials operate to raise material issues of fact as to standing, and it was therefore error for the trial court to enter judgment on the pleadings in favor of plaintiffs. (*Allstate Ins. Co. v. Kim W.* (1984) 160 Cal.App.3d 326, 330-331.)

What this means is, assuming this case proceeds in the trial court, the parties will have to develop evidence regarding plaintiffs' standing in discovery, contest whether the evidence raises a material issue of fact at summary judgment, and, if the issue still is disputed, proceed to trial to decide whether plaintiffs' standing allegations are true. (See, e.g., *Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1082 [material issues of fact as to plaintiff's standing precluded summary judgment]; *Donald v. Sacramento Valley Bank* (1989) 209 Cal.App.3d 1183, 1195-1196 [same].)

In this case, there are numerous ways the plaintiffs may establish standing, each of them involving a complex set of facts about, among other things, how the plaintiffs

---

[18] The main opinion points to the Attorney General's general denial to conclude there was a material issue as to standing. (Maj. opn. *ante*, at p. 18.) I don't believe this is correct, but our conclusion is the same—the pleadings precluded judgment for plaintiffs.

operate their businesses, how they treat their patients, and whether they provide or refuse aid-in-dying services to their terminal patients. For all these reasons, it is a near certainty standing would be determined no earlier than summary judgment, and more likely only after trial.

D. *Standing is No Barrier to Deciding EOLOA is Constitutional*

Unlike my colleagues, I see no point in sending this litigation back to the trial court for plaintiffs to do a better job pleading standing and, more importantly, develop facts to prove it. By insisting on that route, we leave a cloud hanging over the statute, and thereby abandon interested patients, loved ones, physicians, and other health care workers to continuing uncertainty. I believe these circumstances counsel that we resolve the merits of the plaintiffs' cause of action now.

Justice Fields believes there's no reason to be concerned with delay because our opinion vacates the judgment, leaving the parties with "the same rights they had at the inception of this action." (Conc. opn. *ante*, at p. 3.) That's not good enough. The inception of this action casts doubt on the rights and protections EOLOA provided. Though we could dispel the uncertainty, the majority chooses to leave it in place. Patients who may want to avail themselves of the act will continue to make these important decisions under conditions of uncertainty. They may feel rushed to act and even choose to ingest the drugs early. Family members may justly fear they will be deprived of life insurance proceeds if the protections of EOLOA go away again. And doctors may be reluctant to provide prescriptions because a court may abruptly remove

31

their immunity. All these considerations and others counsel the courts to act with alacrity, not merely with "all deliberate speed."

### 1. *We have the discretion to reach the merits and uphold EOLOA*

Fortunately, we can do so. It goes without saying the trial court had the discretion and authority to rule EOLOA constitutional as a matter of law without first resolving the issue of standing. Unlike for the plaintiffs, there is no sense in which the state parties were required to address standing as a threshold issue. Once the plaintiffs raised the purely legal constitutional question by filing its motion for judgment on the pleadings, the trial court gained the power to decide the issue.

Of course, since plaintiffs do have to satisfy the court that they are appropriate plaintiffs to obtain the relief they seek, and because, as I've discussed above, the standing issue could not be decided without factual development, the trial court could dispose of the case on the pleadings only if it ruled the constitutional challenge had no merit. I will explain why I believe the trial court should have reached that constitutional conclusion in part IV below. For now, my point is only that dismissing the cause of action without first reaching the standing issue was within the trial court's discretion and authority. Moreover, doing so would have been far more efficient than abstaining from ruling on the constitutional issue to allow the parties to first conduct discovery on standing and then dispute it at summary judgment or even at trial. That is, in essence, what the majority is doing now.

32

The statute granting authority to enter judgment on the pleadings makes the same point very clear. To rule for a moving plaintiff, "the complaint [must] state[] facts sufficient to constitute a cause or causes of action against the defendant and the answer [must] not state facts sufficient to constitute a defense to the complaint." (Code Civ. Proc., § 438, subd (c)(1)(A).) But to rule in favor of the defendant, "*either* of the following conditions [must] exist: [¶] . . . The court has no jurisdiction of the subject of the cause of action alleged in the complaint [or] [¶] . . . The complaint *does not state facts sufficient to constitute a cause of action* against that defendant." (Code Civ. Proc., § 438, subd. (c)(1)(B), italics added [when the court grants judgment on the pleadings on defendant's motion]; see also Code Civ. Proc., § 438, subd. (c)(3)(B) [when the court grants judgment on the pleadings on its own motion].) These provisions allow the trial court to grant judgment on the pleadings in favor of the state parties if the pleadings establish as a matter of law that plaintiffs could not establish standing *or* the constitutional violation. Since standing was disputed, but the constitutional claim itself is faulty, the court could have and should have entered judgment on the pleadings in the state's favor. (See Code Civ. Proc., § 438, subd. (c)(3)(B) [court may grant judgment on the pleadings for defendant on its own motion].)

We have discretion to rule EOLOA constitutional on appeal for similar reasons. (Code Civ. Proc., § 906 ["the reviewing court may review the verdict or decision . . . which involves the merits or necessarily affects the judgment or order appealed from . . . and may affirm, reverse or modify any judgment or order appealed from and may direct

33

the proper judgment or order to be entered"].)  The trial court ruled on the issue, holding "the End of Life Option Act ('Act') was passed by a special session of the Legislature in violation of Article IV § 3(b) of the California Constitution because the Act is not encompassed by any 'reasonable construction' of the Proclamation granting the special session the authority to legislate."  The ruling concerns the interpretation of the Governor's proclamation, the statute, and a constitutional provision, so it's a purely legal question.  What's more, the parties raised, briefed, and argued the constitutional issue extensively in the trial court and in this court.

Indeed, on appeal, they focused on the constitutional issue almost to the exclusion of the standing issue.  The state parties limited their discussion of standing to three and a half pages at the end of their 44-page amended petition and five pages in their 30-page traverse.  The plaintiffs used only five and a half pages at the end of their 46-page return, and the Fairchild intervenors did not discuss standing at all.  Several amicus briefs focus solely on the constitutional merits.  Finally, the parties addressed the merits at oral argument.

Since we may rule on any legally adequate and dispositive ground which the parties raised in the trial court and on appeal, I would set the unresolved standing question to one side and reach the merits of the constitutional challenge.  (Code Civ. Proc., § 906.)

34

## 2. *We could reach the merits even to find EOLOA unconstitutional*

I recognize why my colleagues would be hesitant to address the merits if they believed EOLOA was unconstitutional. As a court, we should tread lightly when asked to resolve questions that are not—or not yet—ready for adjudication, especially so when we are asked to invalidate an act of a co-equal branch of the government.

"The principle that courts will not entertain an action which is not founded on an actual controversy is a tenant of common law jurisprudence. . . . The concept of justiciability involves the intertwined criteria of ripeness and standing. A controversy is 'ripe' when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made. One who invokes the judicial process does not have 'standing' if he, or those whom he properly represents, does not have a real interest in the ultimate adjudication because the actor has neither suffered nor is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented." (*California Water*, *supra*, 253 Cal.App.2d at pp. 22-23.)

As this court long ago recognized, "In cases challenging governmental actions, the standing requirement is the rudder that allows courts to navigate between two equally objectionable hazards. On the one side is the risk that the judiciary will impinge upon the powers of the other branches of government by issuing advisory opinions. A court cannot reach out on its own to review the actions of the executive or the Legislature. The validity of such actions may only be passed upon when challenged by a litigant whose

35

legal rights have been violated thereby.  'The province of the court is, solely, to decide on the rights of individuals.'  [Citation.]  Were the courts to stray too far towards the advisory opinion hazard we would approach 'that state of affairs where standing may be conferred on a plaintiff whose only concern is concern itself.'"  (*Stocks v. City of Irvine* (1981) 114 Cal.App.3d 520, 530 (*Stocks*).)  That could lead the courts to tread on the powers of the legislative branch.  (See Cal. Const., art. III, § 3 ["The powers of state government are legislative, executive, and judicial.  Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution"].)

However, judicial inaction poses a coordinate hazard.  For "the farther a court goes to avoid the advisory opinion hazard, the closer it comes to . . . shutting off of all reasonable avenues of judicial redress to a truly aggrieved plaintiff."  (*Stocks*, *supra*, 114 Cal.App.3d at p. 530.)  Though we must not substitute our judgment for the policy judgments of the Legislature, it *is* our job to decide whether legislation conforms with the commands of the United States and California Constitutions.  (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53 ["absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function"]; *In re Humphrey* (2018) 19 Cal.App.5th 1006, 1049 ["the highest judicial responsibility is and must remain the enforcement of constitutional rights"].)  More, it is our "basic responsibility to decide the merits of each case individually."  (See, e.g., *Dillon v. Legg* (1968) 68 Cal.2d 728, 737.)

I part ways with my colleagues' judgment about which hazard most menaces here. I think the standing problems the majority has identified are technical and temporary and do not warrant abandoning the public to continued uncertainty. Even if I agreed with the majority's conclusion the complaint limits plaintiffs to the theory they have been injured as physicians who refuse to participate in providing aid-in-dying services, it is obvious they can easily overcome the defect. If they return to the trial court, they will simply seek leave to amend. Both parties acknowledged this likelihood at oral argument, and the majority's disposition leaves that path open. Moreover, I expect they will succeed in convincing the trial court, in its discretion, to allow amendment, because there are theories under which the plaintiffs will be able to plead and prove standing for purposes of bringing their challenge to EOLOA as ultra vires legislation. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242 [trial court has discretion to allow amendment to address problems with a plaintiff's standing, including by substituting new plaintiffs].)

Moreover, unlike in the federal judicial system, in the courts of California, standing is not jurisdictional in the sense it implicates the power of the courts to act. The standing concept "has been largely a creature of twentieth century decisions of the federal courts . . . [and] is rooted in the constitutionally limited subject matter jurisdiction of those courts." (*Jasmine Networks, Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 990, quoting 13A Wright & Miller, Fed. Practice & Proc. (3d ed. 2008) § 3531, p. 6.) That limitation appears in article III of the United States Constitution, which says the

37

judicial power of the federal courts shall extend to certain "cases" and "controversies." (U.S. Const., art. III, § 2.)  Standing is one of several doctrines, including mootness, ripeness, and the political question doctrine, which have developed into the definition of the "case or controversy" requirement under federal law.  (*Clinton v. City of New York* (1998) 524 U.S. 417, 429-430 ["Article III of the Constitution confines the jurisdiction of the federal courts to actual 'Cases' and 'Controversies,' and . . . the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process"].)  Absent a case or controversy, the federal courts adhere to the rule that they lack the power to proceed.  (*Jasmine Networks*, at p. 990.)

However, "as our Supreme Court has written, no such wariness surrounds the subject matter jurisdiction of California courts . . . [because] '[t]here is no similar requirement in our state Constitution.'"  (*Jasmine Networks, Inc. v. Superior Court*, *supra*, 180 Cal.App.4th at p. 990, quoting *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1117, fn. 13; see also *Stocks*, *supra*, 114 Cal.App.3d at p. 532 [refusing to apply federal standing requirement to state challenge to local zoning practices].)  Thus, even if the majority were inclined to rule EOLOA *unconstitutional*, there is no jurisdictional bar to the majority reaching the merits.  There is, however, every practical reason for doing so.  As the majority itself recognizes, the availability of aid-in-dying services "is an issue of great public importance," and "time is of the essence."  (Maj. opn. *ante*, at p. 10.)  In my view, the issues are so important, and the majority's concerns about standing so technical

38

and so easily remedied, that the better path—even accepting their interpretation of the pleadings—is to ignore any pleading problems and decide the case.

Our Supreme Court has long recognized courts have discretion to reach important constitutional issues even where there is doubt about standing.  (*Collier v. Lindley* (1928) 203 Cal. 641, 645 (*Collier*).)  In *Collier*, a trustor created a charitable trust to advance what in his view were charitable causes—good government, improved conditions for workers, education, eugenics, prohibition, free speech, and justice for Native Americans.  (*Id.* at p. 649.)  The trustor also inserted a provision saying Collier would be paid $500 from the trust corpus if the trust were adjudged invalid, a provision designed to enable the parties to obtain an immediate adjudication of whether the trust's objects fell within the scope of permissible charitable purposes.  Collier then sought a declaratory judgment that the trust was invalid.

The Supreme Court noted Collier was not related to the trustor and was not required to perform any services to gain the $500, and characterized the provision as "a thinly veiled attempt to engage the attention and compel the labors of the several courts of record of this state in order to effectuate a judicial determination of the validity or invalidity of said trust at once and *in advance of any real contest or controversy between the parties in interest*."  (*Collier*, *supra*, 203 Cal. at p. 644, italics added.)  In other words, the court concluded Collier did not have standing to bring the lawsuit.  The court concluded "we would have no hesitation in carrying our aforesaid disapproval to the extent of ordering a dismissal of this appeal *but for the fact that there are certain*

39

*questions of public interest which are involved* therein and which arise entirely apart from the interest of the parties to the immediate proceeding." (*Id.* at p. 645, italics added.) The court exercised its discretion and reached the merits, deciding the trust was valid, *precisely because* the litigation raised those important questions about the validity of charitable trusts.[19] (*Id.* at pp. 645, 656-657.)

The Second District Court of Appeal followed the same path in *California Water*. In that case, an association of public utilities sought and obtained declaratory judgment and an injunction that a Los Angeles County water ordinance could not constitutionally apply to investor-owned public utilities. (*California Water*, *supra*, 253 Cal.App.2d at pp. 19-20.) The association prevailed in the trial court, and on appeal the county argued the association did not have standing because the ordinance had never been enforced against its members. The Court of Appeal concluded it should reach the merits of the constitutional challenge despite the standing concerns due to the public's interest in the issue. "[T]he public interest requires that there be an adjudication to settle the constitutional question here presented. Both the respondents and appellants are well aware that the amenability of water utilities to local control is a matter of substantial

_____

[19] The majority makes much of the fact that the Supreme Court focused on the collusive nature of the lawsuit to argue the court did not conclude Collier lacked standing. The majority misreads the decision. The Supreme Court says plainly there was no current controversy between the parties in interest, but disregarded the defect to reach the merits. The whole point of the collusion was to manufacture a dispute to resolve the doubts of the beneficiaries and trustees about the validity of the public interest trust. The collusiveness of the litigation may make it more egregious, but only as an example of a lawsuit in which there was no case or controversy between interested parties.

40

public concern. Were there *any doubt about the justiciability of the controversy, that doubt would be resolved in favor of present adjudication*, because the public is interested in the settlement of the dispute."[20] (*Id*. at p. 26, italics added.)

Other California courts have followed a similar path to reach issues of public interest despite concerns over justiciability. (*Hayward Area Planning Assn. v. Alameda County Transportation Authority* (1999) 72 Cal.App.4th 95, 104 [resolving merits of lawsuit over use of tax funds for road projects despite justiciability concerns because "[f]ailure to resolve the tendered issue now will only create 'lingering uncertainty' with respect to a transportation project that is the subject of widespread public interest"]; *County of Colusa v. Strain* (1963) 215 Cal.App.2d 472, 478 [exercising discretion to decide challenge to criminal ordinance, though challenger had not yet violated it, "[b]ecause of the interest which Mr. Strain alleges in future leveling of his property and because the ordinance affects a substantial segment of the economy in Colusa County"]; *Kirstowsky v. Superior Court* (1956) 143 Cal.App.2d 745, 749 ["where the problem presented and the principle involved are of great public interest, the courts have deemed it appropriate to entertain the proceedings rather than to dismiss the same as being moot"].)[21]

---

[20] The majority points out the *California Water* court also held the plaintiffs had standing. They are correct—I make the same point (*ante*, at pp. 16-17)—but it's of no importance. Holdings in the alternative are nevertheless holdings. (See *Greyhound Lines, Inc. v. County of Santa Clara* (1986) 187 Cal.App.3d 480, 485 ["When an appellate court bases its decision on alternative grounds, none is dictum"].)

[21] The majority argues this is not an appropriate case to recognize "public interest standing" which may apply in writ of mandate cases. I agree this case is not a writ of

41

The California courts are not alone.  Other jurisdictions recognize the power of the courts to address matters of great public interest or importance despite problems with traditional standing.  "Standing questions cannot often be decided by hard and fast rules because of the varying complexity and importance of questions that come before the courts . . .  [S]tanding questions must be viewed in part in light of 'discretionary doctrines aimed at prudently managing judicial review of the legality of public acts.'"  (*Committee for an Effective Judiciary v. State* (Mont. 1984) 679 P.2d 1223, 1226; *see also State ex rel. Ohio Acad. of Trial Lawyers v. Sheward* (1999) 715 N.E.2d 1062, 1103-1104 ["this court will entertain a public action '"under circumstances when the public injury by its refusal will be serious"'"].)

Following those principles, the New Mexico Supreme Court reached the merits of a constitutional challenge to the Governor's attempts to veto portions of legislation.  (*State ex rel. Sego v. Kirkpatrick* (1974) 524 P.2d 975, 977-979.)  "[E]ven though a private party may not have standing to invoke the power of this Court to resolve constitutional questions and enforce constitutional compliance, this Court, in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance."  (*Id.* at p. 979.)  The New Mexico court

---

mandate case.  However, use of the phrase "public interest" in both lines of cases should not cause us to conflate them.  The case law committing to the courts' discretion whether to reach the merits of important cases despite justiciability concerns is independent from the case law concerning public interest standing, is not limited to writ of mandate cases, and *does* counsel resolving the constitutional issue here.

42

upheld some partial vetoes and invalidated others, depending on whether they changed legislative intent. (*Id.* at pp. 978-980.)

Similarly, in *Jenkins v. State* (Utah 1978) 585 P.2d 442, 443, the Supreme Court of Utah held "the usual rule . . . [is] one must be personally adversely affected before he has standing to prosecute an action . . . [but] it is also true this Court may grant standing where matters of great public interest and societal impact are concerned." *Jenkins* involved a challenge to the Legislature's power to act based on its having seated as legislators people employed as administrators and teachers who were barred from serving in the legislature under a provision of the Utah constitution. Despite problems with the plaintiff's standing, the Utah court held the legislature had acted as a de facto legislature and upheld the laws they enacted. (*Ibid.*)

I would follow a similar course in this case to resolve the challenge to our Legislature's actions during the special session. I don't propose to invite citizens to challenge the constitutionality of every legislative enactment that may be accused of exceeding legislative authority. The line of cases I suggest we follow say the courts may exercise their discretion to resolve disputes in the face of traditional standing problems in rare and extraordinary cases which raise important issues of interest to the public. Everyone—from the plaintiffs, to the state, to amicus curiae, to the majority itself— admits this is such a case. We should resolve it now, one way or the other, without fear that doing so will commit us to reviewing the constitutionality of legislative enactments of lesser magnitude.

At bottom, even if you are inclined to rule the statute unconstitutional, deciding whether to entertain the merits of this case is a prudential call, subject to our discretion as a court. Because the majority simply delays resolution out of a concern for technical compliance, and because the issue posed is wholly legal and a matter of substantial public interest, I believe they've made the wrong choice. I would reach the merits now, regardless whether we uphold or strike down the law. However, for the reasons I set out in the next section, I would find the Legislature acted within the scope of the Governor's proclamation when it enacted EOLOA.

The majority labors to tie themselves to the standing mast and resist plaintiffs' siren song. I find their attempts to restrain our actions unconvincing. First, the majority claims we should be "guided by the familiar principle . . . that 'we do not reach constitutional questions unless absolutely required to do so to dispose the matter before us.'" (Maj. opn. *ante*, at p. 18 [quoting *Facebook, Inc. v. Superior Court* (2018) 4 Cal.5th 1245, 1275, fn. 31].) There's no such principle. The majority's quotation is misleading, and the ellipsis is everything. What they leave out is "we should address and resolve statutory issues prior to, and if possible, instead of, constitutional questions." (*Facebook, Inc.*, at p. 1275, fn. 31.) In other words, the familiar principle is the canon of statutory construction which recommends "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." (*DeBartolo Corp. v. Florida Gulf Coast Trades Council* (1988) 485 U.S.

568, 575.)  We employ the canon out of deference to the Legislature, who we presume did not "intend[] to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." (*Ibid.*)  Obviously, that canon has no application here.  We are not faced with conflicting interpretations of statutory language, one of which would invalidate the statute.  We are deciding whether we may reach a constitutional issue in the face of uncertainty about the plaintiffs' standing.

Second, the majority cites several cases characterizing standing as "jurisdictional" at least to the extent the issue may be raised at any time during the life of a case.  (Maj. opn. *ante*, at pp. 14-15.)  Contrary to the majority's argument, these cases did not overrule *Collier* or import the federal article III standing requirement into California law. Indeed, none of them even addresses the question whether the courts have discretion to hear a cause where standing is in question.  Most inapt among these cases is *People ex rel. Lynch v. Superior Court* (1970) 1 Cal.3d 910, a two-page opinion where the Supreme Court refused to void on due process grounds statutory provisions related to prejudgment wage garnishment.  The court abstained because the attorney general, by his own admission, sought a pure advisory opinion "on behalf of the People of the State of California" because "'[t]he various clerks, sheriffs, and marshals of the State of California [who issue and serve writs of attachment] . . . wish to be advised as to what the law is.'" (*Ibid.*)  That's not the circumstance we face at all.  Nor was there any question in *Lynch* whether the issue presented justified easing up on standing requirements, because the court ruled the very same statutory provisions *did* violate due process in two

45

companion cases issued the same day. (*Ibid*.; see also *McCallop v. Carberry* (1970) 1 Cal.3d 903; *Cline v. Credit Bureau of Santa Clara Valley* (1970) 1 Cal.3d 908.)

Third, the majority wrongly characterizes this case as one where the plaintiffs have been determined to lack standing. (Maj. opn. *ante*, at p. 16.) They do so to avoid the Supreme Court's admonition that "[i]f the issue of justiciability is in doubt, it should be resolved in favor of justiciability in cases of public interest." (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 433, fn. 14; see also Maj. opn. *ante*, at p. 15.) The majority pays lip service to the principle, but demurs, "A court cannot resort to this rule . . . when it has no doubt that standing is absent." (Maj. opn. *ante*, at pp. 15-16.) Even if they were correct on this point—and *Collier* and the other cases I discuss show they are not—ours is not such a case. All we can say is we don't yet know whether the plaintiffs will be able to prove standing. In other words, standing is in doubt. In a case of such broad public interest that means we should proceed to the merits.

Finally, a related point. The majority appears to hold the view the courts cannot resolve the purely legal question whether EOLOA was an ultra vires act by the Legislature until we know for certain the plaintiffs have standing to bring that action. As I've discussed above, in this case such certainty is not likely to arrive until trial. Does the majority believe the courts can't reach the purely legal question of EOLOA's constitutionality under article IV, section 3 of the California Constitution until a jury has decided the plaintiffs have standing? That appears to be the implication of their argument, but there's simply no basis for it. The trial court could have ruled the statute

46

constitutional without reaching a decision on standing.  (Code Civ. Proc., § 438.)  If it had, we could have affirmed on the constitutional ground.  (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 550 [appellate court may affirm on any supported basis].)  If we can reach the purely legal issue in that posture, we can reach it here.

Only last year, our Supreme Court reiterated that "[u]nlike the federal Constitution, our state Constitution has no case or controversy requirement imposing an independent jurisdictional limitation on our standing doctrine." (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247-1248.)  In the same decision, the court emphasized our standing jurisprudence has room in the joints, and "reflects a sensitivity to broader prudential and separation of powers considerations elucidating how and when parties should be entitled to seek relief under particular statutes."  (*Id.* at p. 1248.)  I propose we exercise our flexibility here.[22]  The majority's approach is too stiff-kneed.

## IV

## THE CONSTITUTIONALITY OF EOLOA

Compared to the complex knot of standing issues, the merits of the constitutional challenge are straightforward.  The plaintiffs claim the Legislature, by enacting EOLOA, exceeded the authority the Governor conferred and therefore violated the constitution's

---

[22] Justice Fields' concurrence emphasizes *Weatherford* recommends caution in applying the public interest exception to standing in writ of mandate cases.  (Conc. opn. *ante*, at pp. 2-3.)  As I discuss above (*ante*, at fn. 13), this is not a writ of mandate case. In any event, the Supreme Court's note of caution is well-taken, and also perfectly consistent with the majority exercising discretion to reach the merits in a case of such profound public interest as this one, even if—as they believe—standing is in doubt.

47

directive that, during a special session, the Legislature "has power to legislate only on subjects specified in the proclamation." (Cal. Const., art. IV, § 3(b).) They argue the proclamation limited the Legislature to taking up subjects related to health care *funding*.

A. *Background*

In the trial court, the plaintiffs sought judgment on the pleadings on this claim, and the trial court agreed the Legislature had acted beyond its authority as a matter of law. "Giving terminally ill patients the right to request aid-in-dying prescription medication and decriminalizing assisted suicide for doctors prescribing such medications have nothing to do with healthcare funding for Medi-Cal patients, the developmentally disabled, or in-home supportive services, and does not fall within the scope of access to healthcare services, improving the efficiency and efficacy of the healthcare system, or improving the health of Californians. [¶] The Act is not a matter of healthcare funding, and the consideration and enactment of the Act is not supported by a reasonable construction of the language of the proclamation."

The court therefore held EOLOA was void as unconstitutional, "permanently enjoined Defendant State of California from recognizing or enforcing the Act and permanently enjoined the District Attorney of Riverside County ('District Attorney') from recognizing any exceptions the Act creates to existing criminal law," and entered judgment in favor of the plaintiffs.

48

B. *Analysis*

The question we face is strictly legal—requiring us to construe the pleadings, the proclamation, EOLOA, and the California Constitution—so we exercise de novo review of the trial court's determination that the statute is unconstitutional. (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777; *Blaich v. West Hollywood Rent Stabilization Dept.* (2011) 195 Cal.App.4th 1171, 1175; *People v. McKee* (2012) 207 Cal.App.4th 1325, 1338.)

In deciding whether the Legislature acted outside the scope of the Governor's proclamation, we owe substantial deference to the Legislature. It is not enough that we would come to another conclusion ourselves. Under *Martin v. Riley* (1942) 20 Cal.2d 28 (*Martin*), which is binding Supreme Court precedent, we may overrule the Legislature and invalidate legislation they have enacted during a special session *only if* the Legislature was *unreasonable* to conclude the legislation fell within the scope of the Governor's grant of authority. (*Id.* at pp. 39-40.)

"The duty of the Legislature in special session to confine itself to the subject matter of the call is of course mandatory. It has no power to legislate on any subject not specified in the proclamation. [Citations.] But when the governor has submitted a subject to the Legislature, the designation of that subject opens for legislative consideration matters relating to, germane to and having a natural connection with the subject proper." (*Martin*, *supra*, 20 Cal.2d at p. 39.)

49

"The same presumptions in favor of the constitutionality of an act passed at a regular session apply to acts passed at a special session . . . [W]hen the Legislature acting under a special call, undertakes 'to consider subjects and pass laws in response thereto, and such laws receive the approval of the executive, courts are and should of right be reluctant to hold that such action is not embraced in such call, and will not so declare unless the subject manifestly and clearly is not embraced therein.' [¶] Inasmuch as the presumptions are in favor of the constitutionality of the act, it will be held to be constitutional if *by any reasonable construction* of the language of the proclamation it can be said that the subject of [the] legislation is embraced therein." (*Martin*, *supra*, 20 Cal.2d at pp. 39-40, italics added.)

The Governor's proclamation set out six subjects to guide the Legislature during the special session. The first five subjects are specific. Three relate to funding for Medi-Cal, In-Home Supportive Services, and rate increase for providers of Medi-Cal and developmental disability services. (Proclamation p. 1.) Two others relate to ensuring rate increases expand access to services and increasing oversight and management of services for consumers with developmental disabilities. (Proclamation p. 2.) EOLOA plainly does not come within the scope of any of these subjects, nor do plaintiffs claim it does.

The question is whether the aid-in-dying legislation comes within the final approved subject in the proclamation, "legislation necessary to [¶] . . . [¶] . . . [i]mprove the efficiency and efficacy of the health care system, reduce the cost of providing health

50

care services, and improve the health of Californians." (Proclamation p. 2.) This provision is general and has no explicit tie to funding, which leads me to conclude the Legislature was, if nothing else, reasonable in its determination that the proclamation permitted it to consider topics related to health care services even if they were not directly tied to funding. It is reasonable to read that general topic as extending to *any subject* germane to improving the effective delivery of health care services to benefit California residents.

The question we face, then, is whether the Legislature was reasonable to conclude the *aid-in-dying legislation* concerns a subject germane to improving the effective delivery of health care services to benefit California residents. In my opinion, the Legislature acted reasonably. In the first place, the legislation thoroughly regulates an aspect of the physician-patient relationship. It limits what counts as a terminal disease to "an incurable and irreversible disease that has been medically confirmed and will, within reasonable medical judgment, result in death within six months." (§ 443.1, subd. (q).) In so doing, it chooses who may obtain aid-in-dying services, barring physicians from prescribing aid-in-dying drugs to patients with less dire prognoses. The statute also exhaustively lays out for participating physicians how to proceed when considering whether to prescribe an aid-in-dying drug. The physicians must take great care in diagnosing their patients, advising them of their options, ensuring they can make an informed decision, and confirming they are not operating under undue influence. In my

51

view, the Legislature could reasonably have concluded these provisions concern the effective delivery of health care services to Californians.

Indeed, it is hard to imagine taking the contrary view, unless you simply reject the idea that aid-in-dying services can constitute a form of heath care. I don't believe that view is sustainable. More relevant to the issue here, I don't believe the Legislature was *required* to take that view of health care. It is true a patient and a physician who are considering a prescription for an aid-in-dying drug have reached the point where they are no longer attempting treatments aimed at *curing* or *abating* the underlying disease. Such drugs are available only to a patient whose physician believes will die within six months. Before EOLOA, such patients and their physicians would have considered other treatments to mitigate suffering, such as comfort care, hospice care, palliative care, and pain control. These services are health care services, though they don't attempt to cure the patient or address the underlying disease. EOLOA adds another option, one that is especially valuable to patients who, because of their disease, face extended periods of excruciating pain prior to death. I conclude the Legislature did not act arbitrarily in judging that adding this option was germane to health care and the delivery of health care services, and therefore was germane to an approved subject of the special session.

We received an amicus brief and declaration that is helpful on this point. Andrea Saltzman was for many years a licensed California attorney and appellate law specialist who was diagnosed with stage 4 non-smokers lung cancer in 2015. (Amicus Brief of Andrea Saltzman (Amicus Brief) and attached declaration (Declaration) at p. 15.) She

52

recounts her long battle with the disease, including drug therapies, radiation treatments, and surgeries that helped keep the cancer in check with minimal side effects for several years.  (Declaration at pp. 15-16.)  Despite these initial successes at abatement, she now appears to have developed a resistance to her most recent medication, and is discussing her treatment options with her physician.

"My doctor has suggested chemotherapy but, at best, it would only hold off progression of my cancer for a few months, there are serious side effects, and, most important, unlike my targeted therapies, chemotherapy for lung cancer does not work on the brain [where tumors have developed] because of something known as the 'blood-brain barrier.'  [¶]  . . . My oncologist has also discussed palliative care and hospice with me, and these health care options are fully and readily available to me . . . [¶] . . . I have also discussed the option of medical-aid-in-dying with my oncologist.  Although I—not he—first suggested this option, he agrees that it is one of my health care choices—and that it may be the best choice for me . . .  [¶] . . .  Ironically, my oncologist received and relayed my last test results to me on the same day we both heard about respondent superior court's ruling in this case.  The ruling distressed both of us."  (Declaration p. 17.)  Ms. Saltzman decided to file an amicus brief and declaration and gave them to her oncologist to review for accuracy.  (*Ibid.*)  He said he found no problems with what she said and agreed with her that EOLOA is "directly related to [her] health care and health."  (*Ibid.*)

53

Ms. Saltzman's declaration and brief provide an example of how EOLOA augments the medical treatment options for patients who face the very worst prognoses and the prospect of extended suffering. As she points out in her brief, the availability of the aid-in-dying drug affects her physical and her mental health. (Amicus Brief at pp. 11-12.) If she reaches the point of deciding to take the drug, she will do so only to avoid enduring an extended period of suffering at the end of her life. (*Id.* at p. 11.) In that regard, the aid-in-dying drug is very similar to other forms of health care, such as palliative care and pain control treatments, which seek to minimize suffering prior to death. (See § 443.5, subd. (a)(2)(E) [requiring physicians to discuss with patients who request a prescription for an aid-in-dying drug other treatment options like comfort care, hospice care, palliative care, and pain control].) It is impossible, with her experience in mind, to conclude the Legislature acted arbitrarily or irrationally in deciding the Governor's proclamation—which granted authority to address health and health care—embraced aid-in-dying legislation.

I believe we should be especially wary of invading the province of the Legislature when the Legislature itself specifically considered and decided whether the enactment came within the call of the proclamation. The decision to pass the legislation in special session of course itself *implies* that judgment. But in this case we have more. An Assembly member opponent of the bill appealed a ruling that EOLOA was germane to the call of the proclamation. He argued at some length that the bill was not germane because it had nothing to do with *funding* health care. The Speaker responded that the

54

bill was germane to *health care*, and submitted the issue to the Assembly for a vote. The Assembly rejected the appeal and determined the bill was germane to the topics of the proclamation by a vote of 41 to 28. In my view, this history shows the Legislature rejected the interpretation of the proclamation as limiting the special session to health care *funding* instead of health care generally. The Legislature evidently considered the proclamation to be sufficiently broad to cover the topic of aid-in-dying legislation. The Governor seemingly agreed. (*Martin*, *supra*, 20 Cal.2d at p. 42 (Carter, J., concurring) ["since the Governor could have included such subjects in his proclamation, and he having approved the legislation by signing the bill embracing such subjects, I am forced to conclude that he considered his proclamation sufficiently broad to cover the subjects embraced in the bill"].) I would not displace their judgment, and therefore would hold the Legislature validly exercised its power when it enacted EOLOA.

I emphasize "[t]he wisdom or desirability of the manner of" providing aid-in-dying services "is of course not a question for the judicia[ry]. It is concerned only with the question of interpretation." (*Martin*, *supra*, 20 Cal.2d at p. 40.) The last purpose stated in the proclamation's call gave the Legislature power to enact legislation related to improving the delivery of health care services and the health of Californians. The Legislature enacted a law concerned with the delivery of aid-in-dying services and allows services for terminal patients akin to palliative care and pain management care which physicians and other health care providers already supply. From this, I conclude the Legislature acted within its authority when it enacted EOLOA.

55

# V

## CONCLUSION

I agree with the majority's determination the trial court erred in concluding the pleadings established the plaintiffs had standing, and therefore agree with the disposition letting a writ of mandate issue directing the superior court to vacate its order and the judgment. However, I disagree with the majority's decision to bypass deciding whether the Legislature's enactment of EOLOA was constitutional. Because I conclude EOLOA is constitutional, I would go further and direct the trial court to enter judgment in favor of defendants on plaintiffs' third cause of action (violation of article IV, § 3 of the California Constitution).

SLOUGH _____

J.